Per Curiam:
*466 Section 1 of the Kansas Constitution Bill of Rights provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." We are now asked: Is this declaration of rights more than an idealized aspiration? And, if so, do the substantive rights include a woman's right to make decisions about her body, including the decision whether to continue her pregnancy? We answer these questions, "Yes."
We conclude that, through the language in section 1, the state's founders acknowledged that the people had rights that preexisted the formation of the Kansas government. There they listed several of these natural, inalienable rights-deliberately choosing language of the Declaration of Independence by a vote of 42 to 6.
Included in that limited category is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life-decisions that can include whether to continue a pregnancy. Although not absolute, this right is fundamental. Accordingly, the State is prohibited from restricting this right unless it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest. And we thus join many other states' supreme courts that recognize a similar right under their particular constitutions.
Finally, we conclude that the plaintiffs Herbert C. Hodes, M.D., Traci Lynn Nauser, M.D., and Hodes & Nauser, MDs, P.A. (Doctors) have shown they are substantially likely to ultimately prevail on their claim that Senate Bill 95 violates these principles by severely limiting access to the safest procedure for second-trimester abortions. As a result, we affirm the trial court's injunction temporarily enjoining the enforcement of S.B. 95 and remand to that court for full resolution on the merits.
THE LEGISLATION AND THIS CASE'S PROCEDURAL HISTORY
In 2015, the Kansas Legislature enacted S.B. 95, which is now codified at K.S.A. 65-6741 through 65-6749. S.B. 95 prohibits physicians from performing a specific abortion method referred to in medical terms as Dilation and Evacuation (D & E) except when "necessary to preserve the life of the pregnant woman" or to prevent a "substantial and irreversible physical impairment of a major bodily function of the pregnant woman." K.S.A. 65-6743(a).
In this case, the Doctors provide abortions, including D & E procedures, in Kansas. They filed this action challenging S.B. 95 on behalf of themselves and their patients on June 1, 2015. They argued S.B. 95 prevents them *467 from using the safest method for most second-trimester abortions-the D & E method. These restrictions, according to the Doctors, violate sections 1 and 2 of the Kansas Constitution Bill of Rights because they infringe on inalienable natural rights, specifically, the right to liberty.
A graphic description of the D & E procedure referred to in S.B. 95 is not necessary to resolving the legal issues before us. Although the detailed nature of the procedure may factor into the lower court's later decision on the full merits, at this temporary injunction stage the United States Supreme Court's description suffices. That Court explained the procedure involves "(1) dilation of the cervix; (2) removal of at least some fetal tissue using nonvacuum instruments; and (3) (after the 15th week) the potential need for instrumental disarticulation or dismemberment of the fetus or the collapse of fetal parts to facilitate evacuation from the uterus." Stenberg v. Carhart , 530 U.S. 914, 925, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). The Doctors argued, and the trial court found, that 95% of second-trimester abortions in the United States are performed using the D & E procedure.
When the Doctors filed this action, they also filed a motion for temporary injunction to prevent S.B. 95 from taking effect while the case moved forward. The Doctors submitted documentation to support this motion, including two affidavits from board-certified physicians licensed to provide abortion care and one affidavit from an expert on medical ethics.
The defendants, the Kansas Attorney General and the District Attorney for Johnson County (the State), submitted a response opposing the temporary injunction, asserting that the Doctors had failed to show they were entitled to the relief they sought because there is no right to abortion protected by the Kansas Constitution. The State acknowledged that the United States Supreme Court decided in Roe v. Wade , 410 U.S. 113, 157-58, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a fetus is not a "person" entitled to protection under the Fourteenth Amendment to the United States Constitution and that, at least in the early stages of a pregnancy, the State could not interfere with a woman's right to decide whether to continue her pregnancy. But it argued those same rights do not exist under the Kansas Constitution.
Alternatively, the State argued that, if such state constitutional rights exist, S.B. 95 would not violate them. It first pointed to the test adopted by the United States Supreme Court in Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 874-78, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion)-often referred to as the undue burden test or standard-for balancing the burdens imposed on a woman's rights and the State's interests. The State then concluded S.B. 95 does not impose an undue burden on a pregnant woman's right to obtain a lawful abortion, in part because other abortion procedures are available. Before the trial court, the State primarily presented three alternatives: labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.
Following a hearing on the Doctors' motion, the trial court granted the temporary injunction. The court noted (1) this court has repeatedly stated that sections 1 and 2 of the Kansas Constitution Bill of Rights are given much the same effect as the Fourteenth Amendment to the United States Constitution; (2) the United States Supreme Court caselaw provides a framework for analyzing the constitutionality of the Kansas legislation; and (3) under that framework, the Doctors are substantially likely to prevail on the merits of their claim that the legislation is unconstitutional. Citing Casey and other United States Supreme Court decisions that applied its undue burden test advanced by the State, the trial court concluded S.B. 95 is likely to unduly burden access to abortions because it eliminates the most commonly used procedure for second-trimester abortions and the State's proposed alternatives are more dangerous. In rejecting the State's arguments about alternative procedures, the trial court made the following findings of fact regarding those procedures:
• "Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor *468 process in a hospital that will last between 5-6 hours up to 2-3 days, includes increased risks of infection when compared to D & E, and is medically contraindicated for some women."
• "There is no established safety benefit to inducing demise prior to a D & E procedure."
• Regarding fetal demise by either transabdominal or transvaginal injection of digoxin, "[r]esearch studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization."
• "Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses of digoxin, required in cases where a first does is not effective, is virtually unstudied."
• "Umbilical cord transection prior to a D & E is not possible in every case" and, when used, "increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding."
• "The use of transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note that its main limitation is 'a potential lack of generalizability.' "
The State reminds us that it has not yet fully litigated the safety of the various procedures. Nevertheless, it does not suggest the trial court lacked a factual basis for making those findings based on the limited record made for purposes of the ruling on the temporary injunction.
Before us, the State discusses an alternative to the D & E procedure it had briefly mentioned to the trial court: the induction of fetal demise using potassium chloride, otherwise known as KCl. During the trial court proceedings, the Doctors, in apparent anticipation of this alternative being argued, presented affidavits that included facts about this procedure and its risks. Nevertheless, presumably because the State made only a passing reference to this procedure, the trial court did not make any factual finding about it. As a result, this alternative does not factor into our analysis. "[A]ppellate courts do not make factual findings but review those made by district courts." State v. Berriozabal , 291 Kan. 568, 591, 243 P.3d 352 (2010). And the State did nothing to insure adequate factual findings on the issue. See State v. Rodriguez , 302 Kan. 85, 91, 350 P.3d 1083 (2015) (party must object to inadequate findings of fact to preserve issue for appeal). Consequently, the State has essentially waived this alternative-at least for the purposes of this appeal-and we have no basis to consider the State's fact-based argument regarding the comparative safety of the KCl procedure.
After making the findings about the safety risks associated with the three alternatives primarily argued by the State to the trial court, that court cited Gonzales v. Carhart , 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ; Stenberg v. Carhart , 530 U.S. 914, 120 S.Ct. 2597 ; and Planned Parenthood of Missouri v. Danforth , 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Gonzales and Stenberg both dealt with legislation restricting access to D & E procedures. Based on that authority, the trial court concluded: "[T]he Supreme Court has already balanced the State interests asserted here against a ban on the most common method of second-trimester abortion and determined that it is unconstitutional." Finding this indicated a likelihood that the Doctors ultimately would succeed on the merits of their petition, the trial court granted a temporary injunction.
The State immediately appealed from this temporary injunction to the Court of Appeals. That court, sitting en banc, split 6-1-7. Hodes & Nauser, MDs v. Schmidt , 52 Kan. App. 2d 274, 368 P.3d 667 (2016). Seven of the judges concluded that the Kansas Constitution protects a woman's access to abortion services and held that the injunction should be affirmed, but they split 6-1 on the reasons to reach that result. In a plurality opinion, six of the judges adopted the reasoning of the trial court-i.e., that sections 1 and 2 of the Kansas Constitution Bill of Rights are given much the same effect as the Fourteenth Amendment to the United States Constitution. 52 Kan. App. 2d at 275, 368 P.3d 667. One judge wrote separately, concurring in the plurality's result only and reasoning *469 that our state Constitution provides protection of interests separate and distinct from the United States Constitution. 52 Kan. App. 2d at 297, 368 P.3d 667. The seven remaining judges dissented, concluding that the injunction was not warranted because a woman has no right protected by the Kansas Constitution to obtain an abortion. 52 Kan. App. 2d at 330, 368 P.3d 667. Because the panel split evenly on the result, the trial court's temporary injunction remained in place. 52 Kan. App. 2d at 295, 368 P.3d 667.
We granted the State's petition for review, providing our jurisdiction under K.S.A. 60-2101(b).
ANALYSIS
The ultimate question presented in this appeal is whether the trial court erred in granting a temporary injunction. A temporary injunction merely preserves the relative positions of the parties until a full decision on the merits can be made. Steffes v. City of Lawrence , 284 Kan. 380, 394, 160 P.3d 843 (2007). Even so, in order to obtain such an injunction, a plaintiff must show the court: (1) The plaintiff has a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability exists that the plaintiff will suffer irreparable injury without an injunction; (3) the plaintiff lacks an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest. Downtown Bar and Grill v. State , 294 Kan. 188, 191, 273 P.3d 709 (2012).
When a party alleges a trial court erred in issuing a temporary injunction, an appellate court examines whether the court abused its discretion. 294 Kan. at 191, 273 P.3d 709. A trial court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. State v. Ward , 292 Kan. 541, 550, 256 P.3d 801 (2011).
The State primarily contests the trial court's conclusions regarding only one of the five requirements for issuing a temporary injunction-specifically, the first element that requires a plaintiff to establish a substantial likelihood of eventually prevailing on the merits. According to the State, the trial court abused its discretion when it held the Kansas Constitution Bill of Rights protects a woman's right to access abortion. Alternatively, the State argues S.B. 95 does not violate any such rights. In both instances, the State argues the court's decisions were based on an error of law.
These arguments address the two elements the Doctors must establish in order to prevail on the temporary injunction. First, having alleged a violation of the Kansas Constitution Bill of Rights, they must establish this right exists and that our Constitution protects it. Second, the Doctors must establish S.B. 95 unconstitutionally infringes on this right. See State v. Limon , 280 Kan. 275, 284, 122 P.3d 22 (2005).
1. The Doctors' First Burden: Establishing a Constitutional Right
As to the first of the Doctors' burdens, as previously discussed, the trial court applied United States Supreme Court decisions interpreting the Fourteenth Amendment to reach the conclusion that sections 1 and 2 of the Kansas Constitution Bill of Rights, like the Fourteenth Amendment, protect a fundamental right to abortion. In doing so, the trial court followed the guidance that has been provided by this court over the years.
As pointed out by the trial court and the members of the Court of Appeals plurality, this court has often said that sections 1 and 2 have "much the same effect" as the Due Process and Equal Protection Clauses found in the Fourteenth Amendment to the United States Constitution. Generally, this statement has been made in cases where a party asserts violations of both Constitutions without making unique arguments about sections 1 and 2. See, e.g., Limon , 280 Kan. at 283, 122 P.3d 22 ; State ex rel. Stephan v. Parrish , 257 Kan. 294, Syl. ¶ 5, 891 P.2d 445 (1995) ; State ex rel. Tomasic v. Kansas City, Kansas Port Authority , 230 Kan. 404, 426, 636 P.2d 760 (1981) ; Manzanares v. Bell , 214 Kan. 589, 602, 522 P.2d 1291 (1974) ; Henry v. Bauder , 213 Kan. 751, 752-53, 518 P.2d 362 (1974) ;
*470 Tri-State Hotel Co. v. Londerholm , 195 Kan. 748, Syl. ¶ 1, 408 P.2d 877 (1965) ; The State v. Wilson , 101 Kan. 789, 795-96, 168 P. 679 (1917). In yet another case, Alpha Med. Clinic v. Anderson , 280 Kan. 903, 920, 128 P.3d 364 (2006), this court did not depart from that line of cases when asked to determine if the Kansas Constitution protects a woman's right to decide whether to continue a pregnancy.
In Alpha Med. Clinic , this court discussed the "federal constitutional rights to privacy [that] are potentially implicated" by an inquisition seeking abortion records. 280 Kan. 903, Syl. ¶ 10, 128 P.3d 364. These include "the fundamental right of a pregnant woman to obtain a lawful abortion without government imposition of an undue burden on that right." 280 Kan. at 920, 128 P.3d 364 (citing Casey , 505 U.S. at 874-78, 112 S.Ct. 2791 [plurality opinion] ). In referencing the potential that such a right arose under the Kansas Constitution, this court stated: "We have not previously recognized-and need not recognize in this case despite petitioners' invitation to do so-that such rights also exist under the Kansas Constitution." 280 Kan. at 920, 128 P.3d 364.
Thus, the question asserted by the Doctors-whether the Kansas Constitution Bill of Rights independently protects a woman's right to decide whether to continue a pregnancy-was not answered in Alpha Med. Clinic . And it has not been determined in any other case before this court. Moreover, since the ratification of the Fourteenth Amendment in 1868, this court has rarely been asked to focus solely on sections 1 or 2. Litigants typically present sections 1 and 2 in tandem with the Fourteenth Amendment, and Kansas courts have rarely contrasted the Kansas constitutional provisions with the Fourteenth Amendment.
In other contexts, however, this court has acknowledged that "allowing the federal courts to interpret the Kansas Constitution seems inconsistent with the notion of state sovereignty." State v. Lawson , 296 Kan. 1084, 1091-92, 297 P.3d 1164 (2013). Indeed, this court has the authority to interpret Kansas constitutional provisions independently of the manner in which federal courts interpret corresponding provisions of the United States Constitution. This can result in the Kansas Constitution protecting the rights of Kansans more robustly than would the United States Constitution. 296 Kan. at 1090-91, 297 P.3d 1164.
This court has put these principles into practice on occasion and, after doing so, has interpreted a provision of the Kansas Constitution in a manner different from the United States Supreme Court's interpretation of a parallel provision of the United States Constitution. E.g., State v. McDaniel & Owens , 228 Kan. 172, 184-85, 612 P.2d 1231 (1980) (independently interpreting section 9 of the Kansas Constitution Bill of Rights in manner different from the Eighth Amendment to the United States Constitution). Significantly, in Farley v. Engelken , 241 Kan. 663, 740 P.2d 1058 (1987), this court recognized section 1 of the Kansas Constitution Bill of Rights describes rights that are broader than and distinct from those in the Fourteenth Amendment.
Farley addressed the constitutionality of a statute that abolished the collateral source rule in medical malpractice cases. The parties had raised issues relating to the Fourteenth Amendment and sections 1 and 18 of the Kansas Constitution Bill of Rights. This court chose to analyze the issues under the Kansas Constitution, holding it "affords separate, adequate, and greater rights than the federal Constitution. Therefore, [it held] we clearly and expressly decide this case upon sections 1 and 18 of the Kansas Bill of Rights." 241 Kan. at 671, 740 P.2d 1058.
Consistent with Farley 's holding, the Doctors argue the Kansas Constitution Bill of Rights describes stronger rights than the United States Constitution. In contrast, the State argues the Kansas Bill of Rights does not recognize the same rights as have been found to exist under the United States Constitution. The parties have not cited, nor have we found, a decision fully analyzing the divergent positions they pose. Although Farley supports the Doctors' position, the court did not explain its holding that section 1 affords greater rights than the United States Constitution. In addition, Farley did not deal with the personal rights at issue in the present case.
*471 Accordingly, the parties' arguments and Doctors' exclusive reliance on the Kansas Constitution Bill of Rights require us to now delve deeper into the differences between it and the Fourteenth Amendment.
Doing so raises questions of constitutional interpretation. The standard applied by Kansas courts when interpreting the Kansas Constitution was enunciated by this court in 1876. There, it rejected a man's argument that a woman who received more votes than he nevertheless was barred by her gender from holding the office of superintendent of public instruction then described in article 6 of the Kansas Constitution because the same Constitution denied her the right to vote in that race. The court stated:
" '[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing.' " Wright v. Noell , 16 Kan. 601, 607, 1876 WL 1081 (1876).
This court has repeatedly quoted Wright as stating the standard governing this court's constitutional interpretation. See, e.g., State v. Spencer Gifts , 304 Kan. 755, 761, 374 P.3d 680 (2016) ; In re Estate of Strader , 301 Kan. 50, 55, 339 P.3d 769 (2014) ; Gannon v. State , 298 Kan. 1107, 1143, 319 P.3d 1196 (2014). When the words themselves do not make the drafters' intent clear, courts look to the historical record, remembering " 'the polestar ... is the intention of the makers and adopters .' [Citation omitted.]" Hunt v. Eddy , 150 Kan. 1, 5, 90 P.2d 747 (1939) ; see State ex rel. Stephan v. Finney , 254 Kan. 632, 655, 867 P.2d 1034 (1994).
Appellate courts conduct de novo review of issues requiring the interpretation of constitutional provisions, which means appellate courts are not bound by the interpretation of a lower court. See Limon , 280 Kan. at 283, 122 P.3d 22.
We begin our analysis of the issue of whether the Kansas Constitution Bill of Rights protects a woman's right to decide whether to continue a pregnancy by comparing the text of section 1 and the Fourteenth Amendment. This comparison highlights that Kansans chose to protect their "inalienable natural rights," including their liberty.
Second, we examine whether there is any support for the State's argument that the framers of section 1 did not intend to grant individual rights that could be judicially protected. The historical record overwhelmingly shows an intent to broadly and robustly protect natural rights and to impose limitations on governmental intrusion into an individual's rights.
Third, we explore the meaning of a "natural right." We do so by examining the philosophical underpinnings of natural rights, legal recognition of natural rights, the history of state courts recognizing an enforceable natural right of bodily integrity, and the recognition of the concepts of liberty and the pursuit of happiness as including the right to make decisions about parenting and procreation.
Fourth, we consider whether these rights extend to women, as well as men. This leads, fifth, to our examination of whether protections extend to a pregnant woman's right to control her body and to her right to decide whether to continue a pregnancy. And, sixth, we consider the relevance of Kansas territorial and state statutes that criminalized abortion.
Our analysis leads us to the conclusion that section 1 of the Kansas Constitution Bill of Rights acknowledges rights that are distinct from and broader than the United States Constitution and that our framers intended these rights to be judicially protected against governmental action that does not meet constitutional standards. Among the rights is the right of personal autonomy. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life-decisions that can include whether to continue a pregnancy. Although the Doctors, the lower courts here, and various decisions from this court have tended to lump sections 1 and 2 together, we base our decision on section 1 alone because *472 we find it sufficiently protects the rights at stake.
1.1 Section 1 Identifies Rights Distinct from and Broader than Those Listed in the Fourteenth Amendment; It Provides a Nonexhaustive List of Natural Rights.
A comparison of the text of section 1 of the Kansas Bill of Rights, which was part of the Kansas Constitution ratified by the territorial voters in October 1859, and the Fourteenth Amendment to the United States Constitution, which was ratified in 1868, reveals several differences in wording. Again, section 1 states: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." And the Fourteenth Amendment states, in relevant part, that no State can "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
As this side-by-side comparison reveals, section 1 contains the following words not found in the Fourteenth Amendment: "All men are possessed of equal and inalienable natural rights." In fact, no provision of the United States Constitution uses the term "natural rights"-i.e., "[a] right that is conceived as part of natural law and that is therefore thought to exist independently of rights created by government or society." Black's Law Dictionary 1519 (10th ed. 2014); see Ogden v. Saunders , 25 U.S. (12 Wheat.) 213, 319, 6 L.Ed. 606 (1827) (Trimble, J., opinion); 25 U.S. at 345 (Marshall, C.J., opinion). This silence created an ambiguity as to whether rights other than those listed are protected by the United States Constitution. In contrast, the Kansas provision lists certain rights-life, liberty, and the pursuit of happiness-but indicates these are just among the natural rights Kansans possess.
The framers of the Kansas Constitution in 1859 were not alone in adopting a natural rights provision. William Hutchinson, who chaired the "Preamble and Bill of Rights" Committee of the Wyandotte Constitutional Convention that initially developed section 1, explained the history of natural rights declarations to the other Convention delegates when he submitted his committee's report, stating:
"It is a historical fact, that ever since the days of King John, when the magna charta in favor of British freedom was obtained by the English yeomanry, some declaration of rights similar to the one presented by us, has been common with the people of all countries; but it was not until 1776, when that memorable Declaration of ours came into existence, that the people cut loose from a narrow conception of humanity, and entered upon that broad field of human liberty. All the States [State Constitutions] since that day down to [that of] the prospective State of Kansas, have contained a similar instrument, that becomes as it were the timbers of the building-the superstructure upon which the edifice of State must be erected." Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed., 1859), reprinted in Kansas Constitutional Convention 184-85 (1920) (hereinafter Convention).
By the time the Fourteenth Amendment to the United States Constitution was ratified in "1868, twenty-four of the thirty-seven state constitutions existing at that time, nearly a two-thirds majority, contained provisions guaranteeing inalienable, natural, or inherent rights of an unenumerated rights type. Thus, in 1868, approximately 67% of all Americans then living resided in states that constitutionally protected unenumerated individual liberty rights." Calabresi & Vickery, On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees , 93 Tex. L. Rev. 1299, 1303 (2015) (Lockean Natural Rights Guarantees ).
These provisions in state constitutions, which are often referred to as "Lockean Natural Rights Guarantees," originated with the Virginia Declaration of Rights of 1776. The Virginia Declaration, principally drafted by George Mason, relies heavily on the philosophy of John Locke. In particular, Mason "endorsed the Lockean ideal that all men retain some of their natural rights after subscribing to the social compact, in contrast to the idea put forth by Thomas Hobbes and *473 Jean-Jacques Rousseau that men surrender all their natural rights to the sovereign in exchange for security and public order." 93 Tex. L. Rev. at 1314, 1316-17.
Mason's draft served not only as the model for many state constitutions but also for portions of the Declaration of Independence. 93 Tex. L. Rev. at 1318. As we will discuss in more detail when looking at the history of the Kansas Constitution, Kansas' section 1 was patterned after the Declaration of Independence. Convention, at 283. Therefore, we may, by this path, trace our section 1 to the Lockean natural rights guarantees.
Returning to the language of section 1, after using the phrase "inalienable natural rights," it delineates three rights: life, liberty, and the pursuit of happiness. The framers made clear the list was not intended to be exhaustive-rather, the listed rights are "among" the inalienable natural rights recognized by the provision. See Webster's New World College Dictionary 47 (5th ed. 2014) (defining "among" to mean "in the company of; surrounded by; included with a group of"). Two of the three nonexclusive listed rights-life and liberty-are mirrored in the Fourteenth Amendment, while section 1's explicit inclusion of "pursuit of happiness" is absent from the Fourteenth Amendment. Section 1, however, does not list "property," while the Fourteenth Amendment does. Whatever implications arise from that omission need not be plumbed today, because section 1's broad declaration that all men are entitled to a nonexhaustive list of inalienable natural rights clearly reveals that section 1 recognizes a distinct and broader category of rights than does the Fourteenth Amendment.
A final and notable language distinction between section 1 and the Fourteenth Amendment arises from another phrase found in the Amendment but not in section 1 : "without due process of law." In other words, the text of section 1 demonstrates an emphasis on substantive rights-not procedural rights. In contrast, the Fourteenth Amendment's use of "the term 'due process' seem[s] to speak of procedural regularity." Currie, The Constitution in the Supreme Court: The First Hundred Years, 1789-1888, at 272 (1985). Thus, section 1's focus on substantive rights removes from our calculus one of the criticisms of Roe and other decisions of the United States Supreme Court relying on substantive due process rights under the Fourteenth Amendment. See Roe , 410 U.S. at 173, 93 S.Ct. 705 (Rehnquist, J., dissenting).
1.2 The Historical Record of the Kansas Bill of Rights Indicates Section 1 Describes Judicially Enforceable Rights.
The State focuses on the omission of a due process clause from section 1 to argue the rights listed there are aspirational or hortatory and not enforceable or self-executing. Although the State recognizes that the 1859 Wyandotte Constitutional Convention delegates could not have considered the Fourteenth Amendment's inclusion of the due process provision because it was not ratified until nine years after voters ratified the Kansas Constitution, it argues they could have considered the Fifth Amendment to the United States Constitution, which was ratified in 1791. The Fifth Amendment, which applies only to the federal government, provides: "No person shall ... be deprived of life, liberty, or property, without due process of law." Because those attending the Wyandotte Convention could have adopted a similar due process clause but did not, the rights described in section 1 cannot be judicially enforced, according to the State.
The Kansas Constitution does include a due process provision, however: section 18 of the Bill of Rights. It states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law...." But the Wyandotte Convention delegates simply chose to separate the provisions acknowledging rights-for example, section 1-from the due process provision in section 18.
Arguably, the failure to combine sections 1 and 18 creates an ambiguity that underlies the State's argument that section 1 does not provide for judicially enforceable rights. To resolve this potential ambiguity, we next examine the historical record regarding the debates at the Wyandotte Convention as well as the early caselaw interpreting section 1.
*474 Section 1 was incorporated into and adopted as part of the Kansas Constitution that emerged from the Wyandotte Convention and was subsequently ratified by the voters in October 1859. The section has not been amended since that time.
The Wyandotte Convention followed three other conventions: the 1855 Topeka convention at which free-state proponents repudiated the positions on slavery by the 1855 proslavery territorial legislature, the 1857 Lecompton convention convened by the proslavery legislature in order to make slavery an "inviolable" right of property, and the 1858 Leavenworth convention that decried the Lecompton constitution. Congress rejected the constitution produced at the Topeka convention, and Kansas territorial voters rejected the constitution produced at the Lecompton convention. The constitution from the Leavenworth convention was abandoned when the Lecompton constitution was defeated. Thacher, Address at the Quarter-Centennial Celebration: The Rejected Constitutions, in 3 Kansas Historical Collections 436-48 (1886).
In 1859, the Kansas Territorial Legislature called for another constitutional convention, this one to be held in Wyandotte for the purpose of producing a constitution that would be acceptable both to the citizens of the prospective state and to Congress. Elected delegates-all men-included eighteen lawyers, sixteen farmers, eight merchants, three manufacturers, three physicians, a mechanic, a land agent, a printer, and a surveyor. See generally Simpson, The Wyandotte Constitutional Convention , in 2 Kansas Historical Collections 236, 236-38 (1881).
A majority of the delegates who voted chose to use the Ohio Constitution as the foundation for the one they would craft. Perdue, Address Before the Kansas State Historical Society: The Sources of the Constitutions of Kansas, in 7 Kansas Historical Collections 130, 131-32 (1902). At the end of the convention, sections 2 through 20 of the Bill of Rights mirrored those same sections in the Ohio Constitution. Perdue, at 133-34.
Section 1, however, followed a different path, and it "was the only one that led to an extended debate." Perdue, at 134. The first proposed text of section 1 derived from the previous constitutions drafted at the Topeka and Leavenworth conventions and was presented by the Preamble and Bill of Rights Committee. It stated:
"All men are by nature equally free and independent, and have certain inalienable rights, among which are those of enjoying and defending their lives and liberties, acquiring, possessing, and protecting property, and of seeking and obtaining happiness and safety, and the right of all men to the control of their persons, exists prior to law and is inalienable." Convention, at 187.
During the Wyandotte Convention debates regarding section 1, the chairman of that committee, William Hutchinson, commented on the reasons for having an expansive section 1 that protects natural rights:
"This is the first section of our bill of rights. What is a bill of rights? It is a mere declaration of the natural rights of man. And in summing up these rights, it is not to be supposed that we will come down to any narrow, contracted conception of them-that we will use the pocket compass of legislation-but it is to be supposed that we will look on the bright side-will take a fair and independent view of the rights of man, aside from the restrictions of law and civil government of any character.... It is but a declaration of those natural rights of man that have been acknowledged from the foundation of this government." Convention, at 281-82.
These concepts remained a focal point of all the proposals for section 1. In short, the drafters made no attempt to list all rights; they incorporated the broad concept of natural rights (by using that term or substitute descriptions), and they expressed a desire to protect those rights from government infringement.
Despite the apparent consensus on these concepts, reaching agreement on the specific wording proved problematic.
The Topeka constitution had used nearly the same language as proposed by the Hutchinson committee through the word "safety" where the provision ended. The proslavery Lecompton constitution was quite *475 different, allowing rights for only "freemen." The Leavenworth convention returned to the Topeka constitution language but added the words, "and the right of all men to the control of their persons exists prior to law and is inalienable." These "changes in the phraseology [were] made by the Leavenworth committee, with the definite purpose of antagonizing the proslavery sentiment." Perdue, at 134. The antagonism carried over to the Wyandotte Convention.
One proslavery delegate to the Wyandotte Convention expressed the opinion that section 1"was brought forward here for the express purpose of setting the fugitive slave law of the United States at defiance." The delegate went on to explain that section 1 would operate as a " 'liberty bill' " for any fugitive slave who entered the state. Convention, at 274; see Waters, Address Before the Kansas State Historical Society: Fifty Years of the Wyandotte Constitution, in 11 Kansas Historical Collections 47, 49 (1910). Other delegates concurred with this view, and several debated whether including the wording would cause Congress to reject the constitution because of a potential conflict with the federal fugitive slave law. Convention, at 274-81. Delegates also expressed concern that giving inalienable control of a man's person would mean the state "cannot make a man amenable to any criminal law." Convention, at 272.
While other delegates countered that these concerns were unfounded, the "extended" and "violent" debate continued. Several amendments or outright substitutions were proposed. Convention, at 272-82; Perdue, at 134. "To pour oil upon the troubled waters, the first section of the Ohio bill of rights was twice introduced. The first time it was voted down, and the second declared out of order." Perdue, at 134. It read: " 'All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.' " Convention, at 272.
Eventually, the chair of the convention's Judiciary Committee, a lawyer from Hiawatha named Samuel A. Kingman, who two years later became a justice of this court and who eventually served as its Chief Justice from 1867 to 1876, proposed the current wording of section 1 : " 'All men are possessed of equal and inalienable natural rights, among which are those of life, liberty and the pursuit of happiness.' " Convention, at 282-83.
Kingman indicated he could support earlier proposals that granted all men inalienable rights but he preferred his variation based on the Declaration of Independence, which states: "[A]ll men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." Convention, at 282-83. Kingman explained the reasons for using similar language when proposing section 1 : "We all cling to old truths, ... and our national Declaration of Independence is of this class of truth.... I think the amendment I have read, in these old terms, is broad enough. It will show no man's prejudices, and it is broad enough for all to stand upon." Convention, at 283. Kingman's proposal was adopted by a vote of 42 to 6. Convention, at 285.
The Constitution containing Kingman's section 1 language was subsequently approved by Kansas Territory citizens by a vote of 10,421 to 5,530. Following the election of Abraham Lincoln as our sixteenth President and the secession of several southern states in 1861, Congress voted to admit Kansas to the Union as a free state, and President James Buchanan signed the admission bill during his last weeks as our fifteenth president on January 29, 1861. Sutton, Stark Mad Abolitionists 123-25 (2017).
This broad wording of Kansas' section 1, with its unenumerated natural rights guarantee, was not unlike the natural rights guarantees in at least 14 other states' constitutions in place at the time of the Wyandotte Convention. Although the wording of each state's constitutional natural rights guarantee varied, the provisions shared three characteristics. They (1) "affirmed the freedom or equality of men (or both)"; (2) "guaranteed inalienable, inherent, or natural rights"; and (3) "guaranteed a right to enjoy life, liberty," property, the pursuit of happiness, or some *476 combination of these words. Lockean Natural Rights Guarantees , 93 Tex. L. Rev. at 1305-06, 1444-48.
Applying these provisions in cases decided before Kansas convened the 1859 Wyandotte Convention, the courts in many of these 14 states had enforced unenumerated rights through judicial orders. 93 Tex. L. Rev. at 1311-12, 1444-48 (surveying natural rights guarantees in 24 state constitutions-16 of which predated Kansas'-ratified before the adoption of the Fourteenth Amendment and surveying court decisions in these states). These cases provided a context for how these natural rights guarantees would have been viewed at the time of the Wyandotte Convention, and several conclusions that can be drawn from these cases inform our interpretation of section 1.
First, these cases "make[ ] it crystal clear that the Lockean Natural Rights Guarantees did mean something . They did not function as simply vague, preambular language but were instead applied with varying degrees of judicial vigor to decide some of the most challenging and controversial issues of the day." 93 Tex. L. Rev. at 1440. Professor Steven G. Calabresi and Sofia M. Vickery addressed the question posed by the State in this case: Are these guarantees merely hortatory and not enforceable? They answered the guarantees were neither, "after exhaustively studying the case law applying the Lockean Natural Rights Guarantees from the founding of the Republic until 1868" and concluding that "the Guarantees protected rights grounded in natural law...." 93 Tex. L. Rev. at 1304.
Second, the "state supreme courts applied the Lockean Natural Rights Guarantees to an enormous variety of topics, suggesting an understanding during this time that the Lockean Natural Rights Guarantees protected a vast range of unenumerated rights." 93 Tex. L. Rev. at 1442. For example, state supreme courts had invoked the rights guarantees in cases dealing with a number of civil and political rights, including: "(1) freedom of religion; (2) the right of marriage; (3) the involuntary confinement and transportation of the poor; (4) retroactive legislation; (5) the constitutionality of statutes imposing or exempting tort liability"; and (6) a variety of other issues that "show the far-reaching nature of the state court's consideration of liberty and natural or unalienable rights for a very broad range of fact patterns." 93 Tex. L. Rev. at 1364-82.
So, contrary to the State's argument, at the time the Kansas Bill of Rights was written and ratified in 1859, provisions like section 1 were widely accepted as guaranteeing natural rights enforceable via court proceedings.
Kingman, Hutchinson, and the other delegates to the 1859 Wyandotte Convention had this background information when they chose the wording for section 1. We know from the statements of Hutchinson, chair of the Preamble and Bill of Rights Committee, and Kingman, chair of the Judiciary Committee, that section 1's language was intended to be "broad enough for all to stand upon" and that it not be "any narrow, contracted conception" of rights but "a fair and independent view of the rights of man, aside from the restrictions of law and civil government of any character." Convention, at 281-83. This intent has been repeatedly recognized in the caselaw of this court.
In 1876, David Brewer, who at that time was a justice of this court but who became a justice of the United States Supreme Court in 1889, explained that the Kansas Constitution had retained a wide range of individual rights. Writing for a unanimous court that included Chief Justice Kingman, Justice Brewer stated:
" 'All political power is inherent in the people,' and all powers not delegated by the constitution remain with them. These truths, which lie at the foundation of all republican governments, are distinctly asserted in our own bill of rights, §§ 2 and 20. By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action. But beyond those restrictions, and except as to matters guarded by absolute justice, and the inherent rights of the individual, the power of the people is unlimited." Wright , 16 Kan. at 603.
*477 Justice Brewer also explained in several decisions he authored while on this court that the rights in section 1 were judicially enforceable. In one case, counsel argued that "the bill of rights is not to be considered as containing precise limitations upon power, but rather only comprehensive statements of general truths; that it is more in the nature of a guide to the legislature, than a test for the courts." Atchison Street Rly. Co. v. Mo. Pac. Rly. Co ., 31 Kan. 660, 664, 3 P. 284 (1884). In rejecting this argument about the Bill of Rights, Justice Brewer wrote:
"The bill of rights is something more than a mere collection of glittering generalities: some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts , and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." ( Emphasis added.) 31 Kan. 660, Syl. ¶ 1, 3 P. 284.
Consistent with these declarations, this court later recognized a natural right to contract in 1899. See The State v. Wilson , 61 Kan. 32, 36, 58 P. 981 (1899) ; see also Ogden , 25 U.S. at 345 (Marshall, C.J., opinion) (recognizing right to contract as a "natural right[ ]"). A few years after Wilson , citing section 1 along with its discussion of the Fourteenth Amendment, this court recognized the right of "[e]very citizen ... to work where and for whom he will" and a natural right prohibiting one person from being compelled to provide personal services to another. Brick Co. v. Perry , 69 Kan. 297, 298-300, 76 P. 848 (1904).
Then, in a case relied on by the State and the Court of Appeals' dissenting opinion ( Hodes , 52 Kan. App. 2d at 339, 368 P.3d 667 ), this court in Schaake v. Dolley , 85 Kan. 598, 118 P. 80 (1911), seemed to distance itself from these prior decisions. Referring to Justice Brewer's words in Atchison Street Rly. Co. , the Schaake court first noted that section 1 of the Kansas Constitution Bill of Rights"is a political maxim addressed to the wisdom of the legislature and not a limitation upon its power. It is not a mere 'glittering generality' and can not be entirely disregarded in any valid enactment." 85 Kan. at 601, 118 P. 80. But, according to Schaake , "it lacks the definiteness, certainty and precision of a rule ... and consequently can not ... furnish a basis for the judicial determination of specific controversies." 85 Kan. at 601, 118 P. 80.
Certainly, this statement from Schaake supports the State's position here. Nevertheless, it stands in sharp contrast to the court's previous decisions. In addition, it stands apart from later ones. Just three years after Schaake , this court again embraced the rationale that the Bill of Rights provided enforceable rights, this time in the context of section 2. Winters v. Myers , 92 Kan. 414, 140 P. 1033 (1914).
In Winters , the court noted the "glittering generalities" discussions in Atchison Street Rly. Co. and Schaake and assessed how those discussions applied to section 2, which states, in part: "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit." Discussing that language, the Winters court looked to decisions from Wisconsin and Ohio, including one that dealt with a provision much like section 1. In that Wisconsin decision, the court stated:
"This may be said to be somewhat vague and general,-somewhat in the nature of rhetorical flourish; but when it is said that all men equally free have the inherent rights of life, liberty, and the pursuit of happiness, it is certain that it is not meant that some have or may have greater privileges before the law than others. The phrase must mean equality before the law, if it means anything." Black v. State , 113 Wis. 205, 219, 89 N.W. 522 (1902), quoted in Winters , 92 Kan. at 422, 140 P. 1033.
The Winters court found this "vigorous language" persuasive, concluding that section 2 of the Kansas Constitution Bill of Rights, "while declaring a political truth, does not permit legislation which trenches upon the truth thus affirmed. To this extent at least it must, like other constitutional provisions, be *478 interpreted with sufficient liberality to carry into effect the principles of government which it embodies." 92 Kan. at 422, 428, 140 P. 1033.
Soon thereafter, this court made clear that section 1 also could be enforced in the courts as a protection against legislation that impeded the exercise of individual rights. In Wilson , 101 Kan. 789, 168 P. 679, this court recognized that an act suppressing the use of trading stamps would violate the right to contract guaranteed in section 1 if it was an improper use of the State's police power. In resolving the question, the Wilson court looked to caselaw in which the United States Supreme Court had upheld similar legislation, holding it did not violate the Fourteenth Amendment to the United States Constitution. The Wilson court noted: "These decisions are of course conclusive so far as concerns any of the guaranties of the constitution of the United States, and are highly persuasive with respect" to sections 1 and 2 of the Kansas Constitution Bill of Rights. 101 Kan. at 795, 168 P. 679.
In that discussion, the court, for the first time, used the phrase that has often been repeated in Kansas cases for more than 100 years when it stated that sections 1 and 2"are given much the same effect as the clauses of the fourteenth amendment relating to due process of law and equal protection." 101 Kan. at 796, 168 P. 679. The liberty interest found in the Fourteenth Amendment included
" 'the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned.' " 101 Kan. at 796, 168 P. 679 (quoting Allgeyer v. Louisiana , 165 U.S. 578, 589, 17 S.Ct. 427, 41 L.Ed. 832 [1897] ).
More recently, this court recognized the importance of protecting the people's inalienable rights to life, liberty, and the pursuit of happiness:
"So there could be no mistake about its object and purpose, the American Republic officially and with the first breath of its new life declared, 'that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.' (The Declaration of Independence.) This is the American proclamation of freedom and equality, and the individual worth of a single human being." Harris v. Shanahan , 192 Kan. 183, 204, 387 P.2d 771 (1963).
Quoting from that passage, this court has held that "[t]he [Kansas] Bill of Rights protects the basic liberties which inure to each person at birth"-i.e., natural rights. Kansas Malpractice Victims Coalition v. Bell , 243 Kan. 333, 341, 757 P.2d 251 (1988), disapproved on other grounds by Bair v. Peck , 248 Kan. 824, 811 P.2d 1176 (1991). Furthermore, as we previously noted, in Farley , 241 Kan. at 671, 740 P.2d 1058, this court held: "[T]he Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution.
As this discussion illustrates, this court has determined, as have other courts, that section 1 or similar provisions describe a wide range of judicially enforceable rights, even if the provisions do not contain a due process clause and are stated in generalities. See Lockean Natural Rights Guarantees , 93 Tex. L. Rev. at 1305 (recognizing "the Lockean Natural Rights Guarantees [found in state constitutions] might support the holdings" of the United States Supreme Court).
The dissent has opined that section 1 simply was to guarantee
"Kansans their first rights of republican self-rule. Namely, the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to that same common welfare, on the other." Op. at 543.
*479 Abraham Lincoln, whom the dissent cites freely (op. at 531-34), would not be quite so dismissive-particularly on the existence of equal "natural rights." In Lincoln's speech at Springfield, Illinois, on June 26, 1857-just two years before the Wyandotte Convention-he "briefly expressed [his] view of the meaning and objects of that part of the Declaration of Independence which declares that 'all men are created equal.' " Hirsch and Van Haften, Abraham Lincoln and the Structure of Reason, app. A, at 262 (2010).
In expressing his view of this phrase, Lincoln declared that United States Senator Stephen A. Douglas and United States Supreme Court Chief Justice Roger Taney, author of Dred Scott v. Sandford , 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857) (denying equality to black men), were doing "obvious violence to the plain unmistakable language of the Declaration.... [T]he authors of that notable instrument intended to include all men, but they did not intend to declare all men equal in all respects ." Hirsch and Van Haften, app. A, at 262.
Lincoln made clear that in articulating equality the Declaration's authors "did not mean to say all were equal in color, size, intellect, moral developments, or social capacity"-but equal in certain inalienable rights: "They defined with tolerable distinctness, in what respects they did consider all men created equal-equal in 'certain inalienable rights, among which are life, liberty, and the pursuit of happiness.' This they said, and this meant." Hirsch and Van Haften, app. A, at 262.
"They did not mean to assert the obvious untruth, that all were then actually enjoying that equality, nor yet, that they were about to confer it immediately upon them. In fact they had no power to confer such a boon. They meant simply to declare the right , so that the enforcement of it might follow as fast as circumstances should permit." Hirsch and Van Haften, app. A, at 262.
As for his view of the object, i.e., purpose, of their statement of equality, Lincoln reasoned:
"They meant to set up a standard maxim for free society, which should be familiar to all, and revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people of all colors everywhere. The assertion that 'all men are created equal' was of no practical use in effecting our separation from Great Britain; and it was placed in the Declaration, not for that, but for future use ." (Emphasis added.) Hirsch and Van Haften, app. A, at 262.
Lincoln most certainly was not suggesting the breadth of the State's police power that the dissent advocates. We do not disagree with the dissent's position that the people have given the State the power to act only when it does so reasonably and for the common welfare. But based on our Constitution, we fervently object to the dissent's assertion that the State can use this power to do anything it desires so long as it passes that test. The State's police power is limited by the language borrowed from the Declaration of Independence and purposely included in our Bill of Rights-the language explicitly acknowledging that "[a]ll men are possessed of equal and inalienable natural rights." It is clear that Lincoln and an overwhelming majority of the delegates at the Wyandotte Convention saw these words as more than rhetorical flourishes. The language recognized rights that to be meaningful-as they were certainly meant to be-had to be enforced and protected by courts. So when the State attempts to use its police power to unconstitutionally encroach on these inalienable rights, we have an obligation to ensure it does not. As this court stated more than 50 years ago, "the judiciary ... has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people." Harris , 192 Kan. at 206, 387 P.2d 771.
Based on this review of section 1, the Fourteenth Amendment, the differences between them, and the statements of intent by delegates at the Wyandotte Constitutional Convention, we conclude section 1 establishes the judicial enforceability of rights that are *480 broader than and distinct from the rights described in the Fourteenth Amendment.
1.3 Natural Rights Include a Right to Personal Autonomy that Allows Us to Make Decisions Regarding Our Bodies, Our Health Care, Family Formation, and Family Life.
We turn now to the specific questions of what a natural right entails and whether it includes a woman's right to decide whether to continue a pregnancy.
When common-law terms are used in the Kansas Constitution Bill of Rights, courts should look to common-law definitions for their meaning. Addington v. State , 199 Kan. 554, 561, 431 P.2d 532 (1967) ; The State v. Criqui , 105 Kan. 716, 719-20, 185 P. 1063 (1919).
" 'It is also a very reasonable rule that a state constitution shall be understood and construed in the light and by the assistance of the common law, and with the fact in view that its rules are still left in force. By this we do not mean that the common law is to control the constitution, ... but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the beginning of law for the state, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes.' " Criqui , 105 Kan. at 719-20, 185 P. 1063 (quoting Cooley Const. Lim., 7th ed. p. 94).
Because section 1 recognizes "natural rights," we must investigate the historical-the common-law-basis for determining whether an asserted right can be labeled a "natural right." Consequently, we turn to that question.
Certainly, as our prior discussion of the early caselaw of this court reveals, we have been willing to identify "natural rights." Further, the historical record of the Wyandotte Convention reveals the framers of section 1 looked to and adopted the language of the Declaration of Independence. In writing that document, Thomas Jefferson looked to the Virginia Declaration of Rights of 1776, written by George Mason, who, in turn, looked to the writings of Locke. Lockean Natural Rights Guarantees , 93 Tex. L. Rev. at 1316, 1318 ; Convention, at 283. In light of this foundation of section 1, Locke's views on natural rights are significant.
Locke identified the law of nature as the source of inalienable individual rights. He wrote that man is born "with a Title to perfect Freedom, and an uncontrouled enjoyment of all the Rights and Priviledges of the Law of Nature, equally with any other Man, or Number of Men in the World" and thus possesses "a Power ... to preserve his Property, that is, his Life, Liberty and Estate, against the Injuries and Attempts of other Men." Locke, Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698).
In the present case, the Doctors assert that the following natural rights underlie the right of a woman to decide whether to continue a pregnancy: personal autonomy and decision-making about issues that affect one's physical health, family formation, and family life. To test these assertions, we look to the historical and philosophical basis for considering those rights as "natural."
1.3.1 The Philosophy of Locke and Others Recognized Personal Autonomy and Bodily Integrity as Natural Rights.
Locke observed that "every Man has a Property in his own Person ." Two Treatises, Bk. II, § 27. He also wrote about the components of autonomy, bodily integrity, and self-determination, noting that "so far as a man has power to think, or not to think: to move or not to move, according to the preference or direction of his own mind; so far is a man free." Locke, An Essay Concerning Human Understanding, Bk. II, ch. 21, § 8 (27th ed. 1836).
Other political philosophers and legal writers uniformly maintained that one's control over one's own person stands at the heart of the concept of liberty, one of the enumerated natural rights in section 1.
*481 Already in 1642, in his Second Institute, Commentary on Magna Carta, Sir Edward Coke observed that an ordinance setting requirements on the clothes that certain merchants could wear was against the law of the land, "because it was against the liberty of the subject, for every subject hath freedom to put his clothes to be dressed by whom he will." See Pound, The Development of Constitutional Guarantees of Liberty 47-48, 150 (1975).
William Blackstone in his Commentaries identified the private rights to life, liberty, and property as the three "absolute" rights-so called because they "appertain[ed] and belong[ed] to particular men, merely as individuals," not "to them as members of society [or] standing in various relations to each other"-that is, not dependent upon the will of the government. 1 Blackstone, Commentaries on the Laws of England *123, *129-38 (1765). American courts reaffirmed these observations in applying the common law in this country. See, e.g., State v. Moore , 42 N.J.L. 208, 13 Vroom 208 (1880) (quoting 1 Blackstone, at *134: "[T]he law ... regards, asserts and preserves the personal liberty of individuals.").
In his Letter to the Sheriffs of Bristol in 1777, the conservative philosopher Edmund Burke, writing about the American Revolution, reflected the spirit of his times when he declared:
"[I]t ought to be the constant aim of every wise public counsel to find out by cautious experiments, and rational, cool endeavors, with how little, not how much, ... restraint [on liberty] the community can subsist: for liberty is a good to be improved, and not an evil to be lessened. It is not only a private blessing of the first order, but the vital spring and energy of the state itself, which has just so much life and vigor as there is liberty in it." Burke, Selected Works 211 (Bate ed., 1960).
James Madison wrote that a person has an inviolable interest in the "safety and liberty" of one's person. Madison, Essay on Property for the National Gazette (Mar. 27, 1792), in 14 The Papers of James Madison 266 (Rutland & Mason et al. eds., 1983).
Chancellor James Kent, in his Commentaries on American Law, Volume 2, Lecture 24, at 1 (1827), spoke of the right of personal liberty as one of the "absolute rights of individuals." See McMasters v. West Chester State Normal School , 13 Pa. C.C. 481, 2 Pa. D. 753, 757 (1893) ; see also United States v. Verdugo-Urquidez , 856 F.2d 1214, 1220 (9th Cir. 1988) (quoting 2 Kent, at 1; right of personal liberty in the United States considered " 'natural, inherent, and unalienable' "), rev'd on other grounds 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).
1.3.2 The United States Supreme Court Has Recognized the Natural Right of Personal Autonomy.
The natural right to personal autonomy has been recognized by the United States Supreme Court for more than 120 years.
In 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." Union Pacific Railway Co. v. Botsford , 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891).
At about that same time, future United States Supreme Court Justice Louis Brandeis wrote of the "general right of the individual to be let alone," which is a component of the "inviolate personality" of human beings. Warren & Brandeis, The Right to Privacy , 4 Harv. L. Rev. 193, 205 (1890). And he elaborated on this concept nearly 40 years later in Olmstead v. United States , 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting):
"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone-the most comprehensive *482 of rights and the right most valued by civilized men ." (Emphasis added.)
Even when the State regulates health care, demands some medical action such as an immunization, or eliminates treatment options in the interests of public health, safety, and welfare, the government still cannot intrude on a person's control of his or her own body when doing so will cause harm to the individual. See Jacobson v. Massachusetts , 197 U.S. 11, 39, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (upholding mandatory vaccination regulation and its authorizing state statute only because of presumption that legislature intended exceptions where individual could establish he or she "is not at the time a fit subject of vaccination or that vaccination, by reason of his [or her] then condition, would seriously impair his health or probably cause his [or her] death").
1.3.3 State Courts, Including This Court, Have Recognized an Enforceable Natural Right to Bodily Integrity.
Various state courts have reached the same conclusion as the United States Supreme Court. In Illinois, "under a free government at least, the free citizen's first and greatest right, which underlies all others-the right to the inviolability of his person, in other words, his right to himself-is the subject of universal acquiescence." Pratt v. Davis , 118 Ill. App. 161, 166 (1905), aff'd 224 Ill. 300, 79 N.E. 562 (1906). New York's highest court has held: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body...." Schloendorff v. Society of New York Hospital , 211 N.Y. 125, 129-30, 105 N.E. 92 (1914), abrogated on other grounds by Bing v. Thunig , 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957). And the Florida Supreme Court has stated that "everyone has a fundamental right to the sole control of his or her person." In re Guardianship of Browning , 568 So.2d 4, 10 (Fla. 1990).
In interpreting a provision in the Pennsylvania Constitution providing for the rights of enjoying and defending life and liberty, the acquisition and protection of property, and the pursuit of happiness, the Pennsylvania Supreme Court stated:
"The greatest joy that can be experienced by mortal man is to feel himself master of his fate,-this in small as well as in big things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust." Commonwealth v. Murray , 423 Pa. 37, 51, 223 A.2d 102 (1966) (plurality opinion).
The Alaska Supreme Court has concluded that exercising control over one's body "involves the kind of decision-making that is 'necessary for ... civilized life and ordered liberty.' " Valley Hosp. Ass'n v. Mat-Su Coalition , 948 P.2d 963, 968 (Alaska 1997) (quoting Baker v. City of Fairbanks , 471 P.2d 386, 401-02 [Alaska 1970] ). And Mississippi's highest court has held: "Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will." In re Brown , 478 So.2d 1033, 1039 (Miss. 1985).
This court has recognized the same principles, stating: "Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment." Natanson v. Kline , 186 Kan. 393, 406-07, 350 P.2d 1093, decision clarified on denial of reh'g 187 Kan. 186, 354 P.2d 670 (1960).
Each of these court-recognized principles acknowledging the natural-law right to control one's own body and to exercise self-determination stands firmly on the shoulders of the Lockean philosophies embraced in section 1's natural rights, which include liberty and the pursuit of happiness. And these concepts of control over one's body and of self-determination have roots in common law, as the United States Supreme Court noted in *483 Union Pacific Railway Co. v. Botsford , 141 U.S. at 251, 11 S.Ct. 1000, and as this court noted in Natanson v. Kline , 186 Kan. at 406-07, 350 P.2d 1093.
The State argues, however, that the men at the Wyandotte Convention rejected control over one's body as a constitutionally protected right. This argument is based on failure of the convention delegates to adopt the version of section 1 that would have protected property, happiness, and "the right of all men to the control of their persons." Convention, at 271.
The State is wrong to attribute such significance to this rejection. The historical record shows this provision was a taunt to the proslavery delegates at the Leavenworth convention, and the animosity and distrust from that experience obviously tainted the debate in Wyandotte. Convention, at 271-85; see Waters, at 49. Ultimately, the language of section 1 is better understood as continuing a guarantee of natural rights, which include control over one's own body, by using the familiar and revered wording of the Declaration of Independence.
1.3.4 Concepts of Liberty and the Pursuit of Happiness Include a Right to Make Decisions About Parenting and Procreation.
Lockean principles also underlie a recognition that section 1 encompasses a natural right to make decisions about parenting and procreation.
Locke described the rights related to the relationship between a man and a woman as it impacts procreation as follows:
"Conjugal Society is made by a voluntary Compact between Man and Woman, and tho' it consist chiefly in such a Communion and Right in one anothers [sic ] Bodies, as is necessary to its chief End, Procreation; yet it draws with it mutual Support and Assistance; and a Communion of Interest too, as necessary not only to unite their Care and Affection, but also necessary to their common Off-spring, who have a Right to be nourished and maintained by them, till they are able to provide for themselves." Two Treatises, Bk. II, § 78.
Expressing similar views, the United States Supreme Court has acknowledged that the rights "to marry, establish a home and bring up children" were "long recognized at common law as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska , 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In Eisenstadt v. Baird , 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court made additional statements similar to Locke's, noting that a "couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup." The Court recognized the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child" applied to each "individual, married or single." 405 U.S. at 453, 92 S.Ct. 1029.
And significantly, in Chapsky v. Wood , 26 Kan. 650, 652, 1881 WL 1006 (1881), this court recognized that the parent-child relationship is rooted in the "law of nature."
1.3.5 Summary
At the heart of a natural rights philosophy is the principle that individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy. Few decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life. We conclude that this right to personal autonomy is firmly embedded within section 1's natural rights guarantee and its included concepts of liberty and the pursuit of happiness.
1.4 Section 1 Guarantees Women, as well as Men, the Right of Personal Autonomy.
Given that women were not allowed as delegates to the Wyandotte Convention or as voters on the resultant Constitution's ratification, one might question whether the Convention delegates intended to acknowledge in section 1 that women possessed these natural rights. But the record reveals they did. The dissent more fully discusses the historical context, and Kingman clearly explained *484 as much in his report to the convention. He directly stated that "[s]uch rights as are natural are now enjoyed as fully by women as men." Convention, at 169.
At first glance, the sincerity of Kingman's comment seems questionable. After all, he chaired the Judiciary Committee that had considered and denied a petition asking for female suffrage. But the Convention record explains that Kingman and the other delegates distinguished between natural and political rights. After noting that women should have natural rights, Kingman continued by saying on behalf of the committee that "[s]uch rights and duties as are merely political in their character, they should be relieved from, that they have more time to attend to those 'greater and more complicated responsibilities' which, petitioners claim and your committee admits, devolve upon women." Convention, at 169. The comments by Kingman and his committee reflect that society's attitude regarding women at the time was not in step with the natural rights guarantee in section 1. We discuss what impact this has on our analysis in section 1.6.
At the core of the natural rights of liberty and the pursuit of happiness is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This ability enables decision-making about issues that affect one's physical health, family formation, and family life. Each of us has the right to make self-defining and self-governing decisions about these matters.
1.5 Section 1's Protections Extend to a Pregnant Woman's Right to Control Her Own Body.
Denying a pregnant woman the ability to determine whether to continue a pregnancy would severely limit her right of personal autonomy. And abortion laws do not merely restrict a particular action; they can impose an obligation on an unwilling woman to carry out a long-term course of conduct that will impact her health and alter her life. Pregnancy often brings discomfort and pain and, for some, can bring serious illness and even death. The New Mexico Supreme Court described some of these health concerns:
"[T]here is undisputed evidence in the record that carrying a pregnancy to term may aggravate pre-existing conditions such as heart disease, epilepsy, diabetes, hypertension, anemia, cancer, and various psychiatric disorders. According to these sources, pregnancy also can hamper the diagnosis or treatment of a serious medical condition, as when a pregnant woman cannot receive chemotherapy to treat her cancer, or cannot take psychotropic medication to control symptoms of her mental illness, because such treatment will damage the fetus." New Mexico Right to Choose/NARAL v. Johnson , 126 N.M. 788, 855, 975 P.2d 841 (1998).
The list of ways the government's restriction on abortion can have an impact on a woman's ability to control her own body and the course of her life could continue at length. In summary, "[t]he decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman." In re T.W ., 551 So.2d 1186, 1193 (Fla. 1989). Other courts with natural rights constitutional guarantees similar to Kansas' have reached the same conclusion. Some have done so based on privacy, but others have reached the conclusion because of constitutional protections of inalienable natural rights such as liberty-guarantees like that in the Kansas Constitution Bill of Rights.
Although the Wyandotte Convention delegates rejected article I, section 1 of the Ohio Constitution in favor of Kingman's proposal, its language is very similar. It stated that men "by nature" have "certain inalienable rights," including "enjoying and defending life and liberty" and "seeking and obtaining happiness and safety." Applying that provision, the Ohio Court of Appeals recognized it was broader than any provision in the United States Constitution because it recognized natural rights while the United States Constitution did not. "In that sense, the Ohio Constitution confers greater rights than are conferred by the United States Constitution, although that Constitution has been construed very broadly so as to maximize the nature of the individual rights guaranteed by *485 it." Preterm Cleveland v. Voinovich , 89 Ohio App. 3d 684, 691, 627 N.E.2d 570 (1993).
Given the broad scope of the Ohio natural rights provision, the Ohio court determined "it would seem almost axiomatic that the right of a woman to choose whether to bear a child is a liberty within the constitutional protection," including the right to have an abortion. 89 Ohio App. 3d at 691-92, 627 N.E.2d 570.
The Supreme Judicial Court of Massachusetts had arrived at the same conclusion in 1981 after noting that its state constitutional guarantees had "sometimes impelled us to go further than the United States Supreme Court." Moe v. Secretary of Administration & Finance , 382 Mass. 629, 649, 417 N.E.2d 387 (1981). The Massachusetts Constitution, part 1, article I, recognizes individuals have "certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness." See also Mass. Const. pt. 1, art. XII (due process provision).
As to a "woman's right to make the abortion decision privately," the Massachusetts court observed it was "but one aspect of a far broader constitutional guarantee" related to " '[t]he existence of a "private realm of family life which the state cannot enter," ' " the " 'sanctity of individual free choice and self-determination,' " the " 'strong interest in being free from nonconsensual invasion of ... bodily integrity, and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity.' [Citations omitted.]" Moe , 382 Mass. at 648-49, 417 N.E.2d 387. Likewise, the court concluded, " 'decisions whether to accomplish or to prevent conception are among the most private and sensitive.' " 382 Mass. at 649, 417 N.E.2d 387 (quoting Carey v. Population Services International , 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 [1977] ).
A little over a decade later, the highest court in West Virginia, its Supreme Court of Appeals, relied in part on its state constitution to invalidate an abortion funding regulation in Women's Health Center v. Panepinto , 191 W. Va. 436, 446 S.E.2d 658 (1993). The relevant West Virginia constitutional provision declares that the " '[g]overnment is instituted for the common benefit' " of the people. 191 W. Va. at 441, 446 S.E.2d 658. Because the West Virginia Constitution provides guarantees that are not present in the United States Constitution, the court deemed it appropriate to "interpret those guarantees independent from federal precedent," and held that denying funding for certain abortions violated the constitutionally protected right to an abortion. 191 W. Va. at 442, 445, 446 S.E.2d 658.
A woman's right to decide whether to continue a pregnancy has also been recognized under the Mississippi Constitution, which provides: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." Miss. Const. art. 3, § 32. In Pro-Choice Mississippi v. Fordice , 716 So.2d 645 (Miss. 1998), the Mississippi Supreme Court rejected an argument that this provision could not provide for a woman's right to decide whether to continue a pregnancy because abortion was not mentioned in the state constitution. "While we do not interpret our Constitution as recognizing an explicit right to an abortion, we believe that autonomous bodily integrity is protected under the right to privacy as stated in [our previous decision]. Protected within the right of autonomous bodily integrity is an implicit right to have an abortion." 716 So.2d at 653. The Mississippi court observed that " 'no aspects of life [are] more personal and private than those having to do with one's ... reproductive system.' " 716 So.2d at 653 (quoting Young v. Jackson , 572 So.2d 378, 382 [Miss. 1990] ).
Recently the Iowa Supreme Court also has held that the Iowa Constitution's guarantee that " 'no person shall be deprived of life, liberty, or property, without due process of law,' " protects a woman's right to decide whether to continue a pregnancy. Planned Parenthood v. Reynolds ex rel. State of Iowa , 915 N.W.2d 206, 232, 237 (Iowa 2018). The court wrote that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." 915 N.W.2d at 237. It *486 characterized the right to decide whether to continue a pregnancy as "the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world" and noted that "[n]othing could be more fundamental to the notion of liberty." 915 N.W.2d at 237. It concluded that "under the Iowa Constitution, ... implicit in the concept of ordered liberty is the ability to decide whether to continue or terminate a pregnancy." 915 N.W.2d at 237.
The natural right of personal autonomy recognized in these states' constitutions allows individuals to control their own bodies, to make health care decisions, and to make decisions about whether to bear or beget a child. Some of these courts chose the terminology of Roe , 410 U.S. at 153, 93 S.Ct. 705, and spoke in terms of a state constitutional right to "privacy." See Wharton, Roe at Thirty-Six and Beyond: Enhancing Protection for Abortion Rights Through State Constitutions , 15 Wm. & Mary J. Women & L. 469, 521-26 (2009) (discussing state abortion decisions post- Roe ). And this court has recognized privacy as a natural right. See Kunz v. Allen , 102 Kan. 883, 884, 172 P. 532 (1918) (" 'The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence.... A right of privacy in matters purely private is therefore derived from natural law.' "); see also Munsell v. Ideal Food Stores , 208 Kan. 909, 922-23, 494 P.2d 1063 (1972) ; Johnson v. Boeing Airplane Co ., 175 Kan. 275, 262 P.2d 808 (1953). But we agree with the Ohio court that concluded "it is not necessary to find a constitutional right of privacy in order to reach the conclusion that the choice of a woman whether to bear a child is one of the liberties guaranteed by Section 1 [of the] Ohio Constitution." (Emphasis added.) Voinovich , 89 Ohio App. 3d at 692, 627 N.E.2d 570.
Consistent with these and other states, today we hold our Kansas Constitution's drafters' and ratifiers' proclamation of natural rights applies to pregnant women. This proclamation protects the right to decide whether to continue a pregnancy.
We are struck by the ease with which the dissent ignores the importance of this natural right and the consequences women would face if we did not recognize the founders' intent to protect it from an overreaching government. The dissent mentions pregnant women only when discussing the graphic details of the D & E and other medical procedures. By avoiding any other aspect of the lives of pregnant women, the dissent appears to maintain that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination of what is in the common good. Essentially, the dissent exploits the vivid medical details of abortion procedures by turning them into a constitutional prerogative to invade the autonomy of pregnant women and exclude them from our state Constitution's Bill of Rights.
1.6 Territorial and Early State Statutes that Criminalized Abortion Cannot Be the Basis for Ignoring Constitutional Rights.
The State argues we cannot conclude the framers of our Constitution envisioned a right of a woman to decide whether to continue her pregnancy. For support, it cites the Statutes of the Territory of Kansas, 1855, ch. 48, secs. 10 and 39, which made performing any abortion a misdemeanor and performing an abortion on a quickened child manslaughter in the second degree. It points out these laws were carried forward into the first state statutes. See G.L. 1862, ch. 33, secs. 10 and 37.
The State's reliance on the existence of 19th century criminal abortion statutes is wholly unpersuasive. There are three reasons we reject this argument: (1) the history of enactment provides no evidence that the legislation reflected the will of the people; (2) these statutes were never tested for constitutionality; and (3) the historical record reflects that those at the Wyandotte Convention, while willing to recognize some rights for women, refused to recognize women as having all the rights that men had.
As to the first reason, we have only sketchy legislative history regarding the statutes adopted by the 1855 territorial legislature.
*487 But we do know that in slightly more than 30 days this proslavery legislature enacted a complete code of laws consisting of 147 chapters and 1,058 printed pages, the overwhelming majority of which were statutes from the slave state of Missouri. This body became known as the " 'bogus legislature' " because 5,000 Missouri voters took over the polls in the Kansas Territory to elect the members of the legislature. Wilson, How the Law Came to Kansas , 63 J.K.B.A. 26, 29 (January 1994); Wilder, The Annals of Kansas 72 (1886). The bogus legislature's criminal statutes on abortion were virtually verbatim statements of Missouri statutes. Compare Mo. Rev. Stat., Crimes and Punishments, art. II, §§ 9, 10, 36 (1835), with Kan. Terr. Stat. 1855, ch. 48, §§ 9, 10, 39.
What we know about the Missouri laws and the manner in which those laws were passed in Kansas convinces us these early statutes provide little evidence of what a majority of Kansans felt about abortion in 1855. Dr. James Mohr, a historian who focuses his academic work on the history of social policy in America, wrote about the shift in abortion policy in America in his work, Abortion in America: The Origins and Evolution of National Policy, 1800-1900 (1978). His research has been widely cited, including by the United States Supreme Court, see Casey , 505 U.S. at 952, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in part and dissenting in part), and it provides some background on Missouri's abortion statutes, which can be traced back to the first abortion law passed in the United States in 1821.
To first provide some perspective, Dr. Mohr documents that, until the first statute was adopted, abortion in the United States was governed by the traditional British common law. Mohr, at 3. He explains "the practice of aborting unwanted pregnancies was, if not common, almost certainly not rare in the United States during the first decades of the nineteenth century." Mohr, at 16. In fact, women could obtain abortifacient information "from home medical guides, from health books for women, from midwives and irregular practitioners [that is, individuals who were not properly trained], and from trained physicians." Mohr, at 16. "[M]any American women sought abortions, tried the standard techniques of the day, and no doubt succeeded some proportion of the time in terminating unwanted pregnancies. Moreover, this practice was neither morally nor legally wrong in the eyes of the vast majority of Americans, provided it was accomplished before quickening." Mohr, at 16.
In 1821, Connecticut passed the first statute limiting abortion in the United States. It prohibited the use of " 'any deadly poison, or other noxious and destructive substance, with an intention ... to murder, or thereby to cause or procure the miscarriage of any woman, then being quick with child.' " Mohr, at 21 (quoting Conn. Stat. tit. 22, § 14 [1821] ). Mohr explains this law "might best be characterized as a poison control measure." Mohr, at 21. It "did not proscribe abortion per se; it declared illegal one particular method of attempting to induce an abortion because that method was considered prohibitively unsafe owing to the threat of death by poisoning." Mohr, at 22.
After Connecticut's legislation, "three other states-Missouri in 1825, Illinois in 1827, and New York in 1828-also passed laws that dealt specifically with abortion. Both the Missouri law and the Illinois law followed Connecticut's 1821 statute closely and, like the Connecticut law, they were as much poison control measures as antiabortion measures." Mohr, at 25-26. Unlike the Connecticut statute, the Missouri law deleted any reference to quickening, but "in practice, indictments could not be brought under these laws before quickening because intent had to be proved and the only way that intent could be proved was to demonstrate that the person who administered the poison could have known beyond any doubt the woman was pregnant." Mohr, at 26.
The New York statute instead "addressed abortion in three separate clauses." Mohr, at 26. It influenced subsequently adopted provisions in other states, and it seems this influence extended to the Missouri Legislature. In 1835, Missouri amended its poison-control abortion laws and the new law, although not identical to New York's law, was very similar. Compare 2 N.Y. Rev. Stat. pt. IV, ch. I, tit. 2, §§ 8, 9, and tit. 6, § 21 (1828), with Mo.
*488 Rev. Stat., Crimes and Punishments, art. II, §§ 9, 10, 36 (1835). The similarity makes the history of the 1828 New York legislation relevant.
Mohr explains that the passage of the 1828 New York legislation, while including physiological and moral arguments about abortion, "was inextricably bound up with the history of medicine and medical practice in America," specifically in the movement to regulate the medical profession. Mohr, at 31, 36. Historically, there had been little regulation of the credentials required to hold oneself out as a medical practitioner. "As early as 1800, for example, two-thirds of the people who made their livings as physicians in the city of Philadelphia were neither members of the local College of Physicians nor graduates of any medical school of any kind." Mohr, at 32. Outside the cities, "regular" physicians-"those physicians dedicated to the principles of what later became scientific medicine"-were very rare. Mohr, at 32-33. Instead, in rural areas like Missouri or the Kansas Territory, "irregulars" or "self-taught lay healers and part-time folk doctors dispensed medicines of all kinds and performed simple surgery." Mohr, at 33.
The proliferation of the "irregulars" created "an intense competition for paying patients that hurt the regulars badly." Mohr, at 34. The regulars turned to state legislatures, and in New York, "by controlling through the speaker of the assembly all appointments to the standing committee on medical practice, [they] had pushed through the legislature in 1827 the toughest medical regulation law the state had ever had." Mohr, at 37-38.
The following year, the New York Legislature's revisers reported they listened to the " 'old and experienced surgeons' " in drafting additional, medically related sections of the state code, including the abortion provisions. Mohr, at 38. These new requirements included a mandate that no therapeutic abortion could occur unless two physicians, who by operation of the 1827 provisions meant two "regulars," had been consulted. Mohr, at 38. In the Missouri version of the statute, only one physician had to be consulted. Mo. Rev. Stat., Crimes and Punishments, art. II, § 36 (1835). In New York, the wide-ranging regulation of the medical field led to "[i]rregulars organiz[ing] protests and launch[ing] a counteroffensive of major proportions in favor of what might be termed laissez-faire medicine." Mohr, at 38. As a result, New York's abortion law "lay buried in the code, unenforced." Mohr, at 39.
Mohr concludes the "first wave of abortion legislation in American history," which included Missouri's provisions, "emerged from the struggles of both legislators and physicians to control medical practice rather than from public pressures to deal with abortions per se" and "were aimed ... at regulating the activities of apothecaries and physicians, not at dissuading women from seeking abortions." Mohr, at 43. Moreover, "not a single one of these early abortion provisions was passed by itself. They were all contained in large revisions of the criminal codes in their jurisdictions or in omnibus 'crimes and punishments' bills." Mohr, at 42.
Mohr found this significant, noting: "[T]here was no substantial popular outcry for anti-abortion activity; or, conversely, no evidence of public disapproval of the nation's traditional common law attitudes." Mohr, at 42. According to Mohr, "[n]o legislator took a political stand" or cast a recorded vote on stand-alone abortion legislation. "The popular press neither called for nor remarked upon the passage of the acts; the religious press was equally detached." Mohr, at 42. Instead, Mohr attributes the statutory language to "the regular physicians to whom ... legal scholars would look for guidance in drafting their codes." Mohr, at 42. "But as far as the vast majority of the population was concerned, the country's first laws on abortion remained deeply buried in the ponderous prose of criminal codes and were evidently little noticed and rarely enforced by anybody." Mohr, at 43; see Siegel, Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection , 44 Stan. L. Rev. 261, 282 (1992) (In the early 1800s, "America's politicians, clergy, and press were silent on the question of abortion."). Most organized religions in America, including Catholic, Protestant, and Jewish denominations, did not condemn early-term abortions until after criminal abortion *489 laws were already on the books. See Roe , 410 U.S. at 160-61, 93 S.Ct. 705 ; Reagan, When Abortion Was a Crime 6-14 (1997).
This history does not reflect the type of antiabortion sentiment the State wishes to ascribe to the genesis of Kansas' early abortion statutes. And the legislative record suggests Kansas territorial legislators gave no consideration to the appropriateness of the abortion statutes. Given that the 1855 bogus legislature's criminal statutes on abortion were virtually verbatim recitations of Missouri statutes, and buried in the approximately 300 sections of Missouri's criminal statutes that Kansas adopted, little, if any, weight can be accorded these statutes as expressing the will of the people of the Kansas Territory at the time of the Wyandotte Convention four years later.
Without much ado, the 1859 Territorial Legislature simply reenacted most, if not all, of the criminal code from the bogus legislature. See House J. 1859, p. 42. Since proslavery legislators were now outnumbered, the deleted statutes involved crimes related to slaves, e.g., assisting in their escape or specifically criminalizing conduct related to "negroes or mulattoes." Compare Kan. Terr. Stat. 1855, ch. 151, with Kan. Terr. G.L. 1859.
Once Kansas became a state, the procedure was much the same. The bill admitting Kansas to the Union was signed by President James Buchanan on January 29, 1861. Charles Robinson took the oath as governor on February 9, and he asked the Legislature to meet on March 26. That first Legislature, as one member would later recall, spent its time "passing just such laws as were necessary to put the state government in motion." Ballard, Address Before the Kansas State Historical Society: The First State Legislature, in 10 Kansas Historical Collections 232, 232-33, 237 (1908). Indeed, the "General Laws of the State of Kansas, passed at the First Session of the Legislature" (i.e., 1861 session laws) show the only criminal law change during these early months of the Civil War was to add treason and disloyalty crimes on May 21, 1861. G.L. 1861, ch. 27.
During the second legislative session in 1862, a committee was appointed to " 'ascertain what laws are in force at this time, and what laws have become obsolete or repealed by implication.' " Baker, Address Before the Kansas State Historical Society: The Kansas Legislature in 1862, in 3 Kansas Historical Collections 101, 107-08 (1885) (quoting resolution on January 27, 1862). The committee was not tasked with looking at the merits of any legislation.
Even given the committee's limited task of determining what statutes were in effect, its members obviously felt rushed. The committee reported:
" 'Owing to want of time, the committee have not been able to give the work that care and attention which it should have had.... It would indeed be difficult, in the time allowed us to perform this work, to select from the mass of legislation now upon our statute books, all the laws and parts of laws in force, and omit all which have been repealed, suspended, and become obsolete, without fault or mistake.... We have inserted all laws about which we have any doubt, preferring that the error, if there was any, should be on the safe side.' " Baker, at 108.
The Legislature acted as a committee of the whole to hear the report on the night before adjournment. In a speech before the Kansas Historical Society, the President of the Society described the Legislature's handling of the report:
"The chairman stood for three hours reading the report, making motions to amend, strike out, &c., &c., and receiving the paper balls which were hurled at him. Every motion he made was carried with a whoop, and he might have inserted an appropriation to himself for any amount, without its being discovered." Baker, at 108.
Given the way in which these bills were passed, we cannot know what a majority of the legislators-much less the people in the Kansas Territory or the new state-thought about abortion. For this reason, we give them little weight. Indeed, the "General Laws of the State of Kansas in force at the close of the session of the Legislature [e]nding March 6th, 1862," reveal the crimes and punishments statutory sources are the "Acts *490 of 1859" of the Territorial Legislature plus the treason-based acts of the 1861 Legislature. G.L. 1862, chs. 33 and 34.
The second reason the statutes do not warrant deference in our constitutional analysis is that, obviously, the Kansas Constitution and section 1 of its Bill of Rights did not apply to the territorial laws that predated the Wyandotte Convention and those territorial laws were never tested for constitutionality. Constitutions are supreme over statutes-whether territorial or state. Atkinson v. Woodmansee , 68 Kan. 71, 90-91, 74 P. 640 (1903) (citing Fairbank v. United States , 181 U.S. 283, 285-86, 21 S.Ct. 648, 45 L.Ed. 862 [1901] [Brewer, J.] ). Additionally, no Kansas reported court decision discusses whether the state abortion statutes were constitutional. And nothing in the history of the Wyandotte Convention or the text of the Kansas Constitution indicates the framers intended to create any exceptions to the natural right of personal autonomy. Finally, "the fact that an unconstitutional statute has been enacted and has remained in the statute books for a long period of time in no sense imparts legality.... Age does not invest a statute with constitutional validity, neither does it rob it of such validity." State v. Hill , 189 Kan. 403, 410, 369 P.2d 365 (1962).
The third reason we reject the State's reliance on the territorial and early state statutes arises from the gender-differentiated rights recognized at that time. The biases reflected in these differences, which we now recognize as discriminatory, manifested in a majority of legislators serving in Missouri and Kansas during the 1800s who failed to actually recognize all the natural and political rights of women, regardless of whether the Constitution recognized them. To appreciate the bias, one need only note the conduct barring women from the Wyandotte Convention and from voting on the resultant Constitution's ratification.
The Kansas Constitution initially denied women the right to vote in most elections, to serve on juries, and to exercise other rights that we now consider fundamental to all citizens of our state. See Kan. Const. art. 5, § 1 and art. 15, § 6 (1861). These types of limitations had a long history in England and the United States, as the following examples demonstrate.
The venerable Magna Carta, in its charter of rights, stated: " 'No one shall be arrested or imprisoned upon the appeal of a woman, for the death of any other than her husband.' " Pound, at 125 (quoting McKechnie's translation of Magna Carta, ¶ 54). In 1765, Blackstone explained, in his Commentaries on the Laws of England, Volume 1, at *442-45, that a married woman had no separate legal existence from her husband and she could "bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued, without making the husband a defendant." Blackstone noted the law permitted a husband "to restrain a wife of her liberty." 1 Blackstone, at *445.
The English common-law deprivation of rights for women was transported to the new world. In 1845, Edward Mansfield wrote:
"[T]he husband's control over the person of his wife is so complete that he may claim her society altogether; that he may reclaim her if she goes away or is detained by others; that he may use gentle constraint upon her liberty to prevent her going away, or to prevent improper conduct; that he may maintain suits for injuries to her person; that he may defend her with force; that she cannot sue alone; and that she cannot execute a deed or valid conveyance, without the concurrence of her husband. In most respects she loses the power of personal independence, and altogether that of separate action in legal matters." Mansfield, The Legal Rights, Liabilities and Duties of Women 272-73.
Under the common law, a "feme-covert" could not contract, even with the assent of her husband, for the sale of her real estate. See, e.g., Butler v. Buckingham , 5 Day 492 (Conn. 1813). The common law recognized a right of a husband to punish his wife by beating her with "a rod no larger than the diameter of his thumb." See, e.g., Feltmeier v. Feltmeier , 333 Ill. App. 3d 1167, 1169 n.1, 777 N.E.2d 1032, 268 Ill.Dec. 109 (2002) ; State v. Oliver , 70 N.C. 60, 61 (1874). The common-law spousal exception to rape continued *491 in this country for nearly 200 years. See Shunn v. State , 742 P.2d 775, 777 (Wyo. 1987).
In Bradwell v. The State , 83 U.S. 130, 16 Wall. 130, 21 L.Ed. 442 (1872), the Supreme Court upheld a state's rejection of a woman's application for admittance to practice law. A concurring opinion of three of the court's justices pointed out that, under the common law, only men were admitted to the bar. 83 U.S. at 140. The concurrence explained the legal status of women at the time:
"The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. So firmly fixed was this sentiment in the founders of the common law that it became a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state; and, notwithstanding some recent modifications of this civil status, many of the special rules of law flowing from and dependent upon this cardinal principle still exist in full force in most States." 83 U.S. at 141.
By 1879, in Strauder v. West Virginia , 100 U.S. 303, 310, 25 L.Ed. 664 (1879), the Supreme Court held that the Constitution protected the right of males of color to sit on juries but not the right of women to do so.
And, as late as in 1910, in Thompson v. Thompson , 218 U.S. 611, 31 S.Ct. 111, 54 L.Ed. 1180 (1910), the Supreme Court upheld the common-law rule that a wife could not recover damages from her husband for assault and battery committed by him against her person. Abrogating this common-law relationship might unleash "evils" upon society and would "open the doors of the courts to accusations of all sorts of one spouse against the other." Rejecting the common law in this regard would constitute "radical and far-reaching changes in the policy of the common law." 218 U.S. at 617-19, 31 S.Ct. 111.
We recognize that many do not view abortion through a lens of gender bias. But we cannot ignore the prevailing views justifying widespread legal differentiation between the sexes during territorial times and the reality that these views were reflected in policies impacting women's ability to exercise their rights of personal autonomy, including their right to decide whether to continue a pregnancy. See Siegel, 44 Stan. L. Rev. 261. In essence, the history of women's rights contemporaneous to the Wyandotte Convention reflects a paternalistic attitude and-despite what the Constitution said-a practical lack of recognition that women, as individuals distinct from men, possessed natural rights. We no longer live in a world of separate spheres for men and women. True equality of opportunity in the full range of human endeavor is a Kansas constitutional value, and it cannot be met if the ability to seize and maximize opportunity is tethered to prejudices from two centuries ago. Therefore, rather than rely on historical prejudices in our analysis, we look to natural rights and apply them equally to protect all individuals. Territorial and early state statutes do not compel another result or rationale.
1.7 Conclusion: Section 1 Protects a Right to Determine Whether to Continue a Pregnancy.
As discussed, we reach our conclusion that section 1 of the Kansas Constitution Bill of Rights protects a woman's right to make decisions about whether she will continue a pregnancy based on several factors. These include an analysis of natural rights, Lockean principles, the caselaw of Kansas, the rationale and holdings of court decisions from other jurisdictions reviewing broad constitutional natural rights provisions or other provisions similar to ours, and the history of early statutes limiting abortion in Kansas. These factors lead us to conclude that section 1's declaration of natural rights, which specifically includes the rights to liberty and the *492 pursuit of happiness, protects the core right of personal autonomy-which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows Kansans to make their own decisions regarding their bodies, their health, their family formation, and their family life. Pregnant women, like men, possess these rights.
2. The Doctors' Second Burden: Establishing an Unconstitutional Infringement
Now that the Doctors have established a protected right, they must show an unconstitutional infringement of that right. One may question whether the Legislature may adopt any restrictions that implicate a natural right, declared in section 1 to be inalienable.
In answering this question, we start by observing that the Kansas Constitution does not begin with an enumeration of the powers of government. It instead begins with a Bill of Rights for Kansans, which in turn begins with a statement of acknowledged inalienable natural rights, among which are life, liberty, and the pursuit of happiness. By this ordering, demonstrating the supremacy placed on the rights of individuals, preservation of these natural rights is given precedence over the establishment of government. Cf. State ex rel. Zillmer v. Kreutzberg , 114 Wis. 530, 532, 90 N.W. 1098 (1902).
Further, a state constitution's bill of rights "is inserted in the constitution for the express purpose of operating as a restriction upon legislative power." Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 176 (1868). Even though those in the Kansas Territory recognized the advisability of establishing a government that would protect the common welfare, by starting the Kansas Constitution with the Bill of Rights, the founders, like those in other territories, set the limit beyond which "no human legislation should be suffered to conflict with the rights declared to be inherent and inalienable ." Bateman, Political and Constitutional Law of the United States of America 17 n.1 (1876). Bills of rights in state constitutions acted as "admonitions to the legislature which aimed at preventing the abuse of private rights. " Elliott, The Constitution as the American Social Myth , in The Constitution Reconsidered 217 (Read ed., 1938).
Does all of this mean no governmental action may infringe to any degree on such rights? We turn to that question.
2.1 The Historical Record Demonstrates a Recognition and Acceptance that Governmental Regulations Could Encroach on Rights.
The debates about the wording of section 1 at the Wyandotte Convention suggest the framers did not intend to prohibit all government encroachment of natural rights. Kingman told his fellow delegates that "the word 'inalienable' has a fixed meaning in law." Convention, at 282. He gave an example: "[W]hen in the common use of the word we say, that a man cannot alienate his property, none would suppose we mean to say, he cannot forfeit his property." Convention, at 282-83. Referring to the constitution's homestead provision, "which shall be inalienable," he indicated his committee did "not propose to ordain that it shall not be forfeited for debts due to the State, and so on." Convention, at 283.
Nor did Locke himself view inalienable rights as being totally outside the purview of regulation in an organized society. He viewed some regulation of natural rights as essential to civil society because there is no privilege to violate the rights of others. Two Treatises, Bk. II, §§ 87, 95. But that regulation cannot be so extensive or invasive that these natural rights are surrendered completely. Two Treatises, Bk. II, § 131 (a person forgoes natural rights "only with an intention ... to preserve himself his Liberty and Property"); see Barnett, The Proper Scope of the Police Power , 79 Notre Dame L. Rev. 429, 450-56, 479-86 (2004) (discussing Locke's theories and their understanding during the time period of the Wyandotte Convention).
This means that, as long as an individual remains within her (or his) private domain, she may do as she pleases, provided her "conduct does not encroach upon the rightful domain of others. As long as [her] actions remain within this rightful domain, other *493 persons-including persons calling themselves government officials-should not interfere without a compelling justification ." (Emphasis added.) 79 Notre Dame L. Rev. at 446.
2.2 Courts Review Whether a Compelling Justification Exists Under a Strict Scrutiny Standard.
What then constitutes a compelling justification? The United States Supreme Court and this court have adopted a standard for courts to apply when determining if the government has met its burden of establishing a compelling justification for enactments. The standard is referred to as "strict scrutiny." See Farley , 241 Kan. at 669-70, 740 P.2d 1058 ; Fallon, Strict Judicial Scrutiny , 54 UCLA L. Rev. 1267 (2007) (providing a comprehensive history of strict scrutiny review and tracing its development); see also Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny , 48 Am. J. Legal Hist. 355 (2006) (same). The strict scrutiny standard, also called the strict scrutiny test, is part of a three-tiered set of standards generally applied to claims under the Fourteenth Amendment to the United States Constitution. Initially, these standards were applied in equal protection cases, but the United States Supreme Court has expanded the application of strict scrutiny review to include government violations of fundamental rights under the Due Process Clause. Fallon, 54 UCLA L. Rev. at 1281-84. A robust body of United States Supreme Court caselaw sets out the parameters of the strict scrutiny standard and how courts should apply it.
This court, when considering claims brought concurrently under section 1 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment to the United States Constitution, has recognized and adopted these three standards. Farley , 241 Kan. at 669, 740 P.2d 1058. They are: (1) the rational basis standard, which requires only that the legislative enactment bear some rational relationship to a legitimate state interest; (2) the heightened or intermediate scrutiny standard, which requires the enactment to substantially further an important state interest; and (3) the strict scrutiny standard, which requires the enactment serve some compelling state interest and be narrowly tailored to further that interest. Grutter v. Bollinger , 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (strict scrutiny); Romer v. Evans , 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (rational basis); Craig v. Boren , 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (intermediate scrutiny). The determination of which of the three standards applies depends on the nature of the right at stake. Farley , 241 Kan. at 669, 740 P.2d 1058.
The most searching of these standards-strict scrutiny-applies when a fundamental right is implicated. Thompson v. KFB Ins. Co. , 252 Kan. 1010, 1017, 850 P.2d 773 (1993) ; see State v. Ryce , 303 Kan. 899, 957, 368 P.3d 342 (2016). As we have already noted, the natural right of personal autonomy is fundamental and thus requires applying strict scrutiny. As such, to justify S.B. 95, the State must establish a compelling interest-one that is "not only extremely weighty, possibly urgent, but also rare-much rarer than merely legitimate interests and rarer too than important interests." Fallon, 54 UCLA L. Rev. at 1273.
The strict scrutiny standard has been applied in cases where the government has imposed restrictions on abortions. Initially, the United States Supreme Court applied the strict scrutiny standard in Roe , 410 U.S. at 154-55, 93 S.Ct. 705, and its companion case, Doe v. Bolton , 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), to state statutes restricting access to medical procedures used to end a pregnancy.
The Court adopted a different standard in Casey -a case that addressed restrictions on women's access to abortion. In doing so, the Court observed that the Roe Court had adopted a trimester-based framework when deciding the point during a pregnancy at which the State's interest in regulating abortion was significant enough to impose restrictions on the procedure. Casey , 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion). During the first trimester, the State had no compelling interest and could not restrict abortion; during the second trimester, it could restrict abortion to ensure the woman's *494 safety; and during the third trimester-when science then considered a fetus viable-its interest was compelling enough to completely prohibit the procedure unless it put the woman's life or health in danger. Casey , 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion).
The Casey Court noted that medical advances had made it safe for women to have abortions later in pregnancy and had advanced viability to an earlier time in the pregnancy. But it concluded "these facts go only to the scheme of time limits on the realization of competing interests" and have "no bearing on the validity of Roe 's central holding" regarding a woman's right to terminate her pregnancy. 505 U.S. at 860, 112 S.Ct. 2791. After reaffirming Roe 's conclusions on a woman's right to choose an abortion, the three authoring justices in Casey realigned the "other side of the equation[, which] is the interest of the State in the protection of potential life." Casey , 505 U.S. at 871, 112 S.Ct. 2791 (plurality opinion). Rather than the traditional strict scrutiny standard, the three justices adopted an "undue burden" standard for the State to meet. 505 U.S. at 876, 112 S.Ct. 2791 (plurality opinion). As we will discuss, this standard is less rigorous than strict scrutiny.
Under the undue burden standard, the three justices divided pregnancy into two stages, with different rules applying to each stage. Before viability of the fetus, states could adopt measures designed "to persuade the woman to choose childbirth over abortion" as long as those measures were "reasonably related to that goal" and did not impose an "undue burden" on the woman's ability to obtain an abortion. 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion). The decision defined "undue burden" as a law whose "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion). After viability, states could " 'regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " 505 U.S. at 879, 112 S.Ct. 2791 (plurality opinion) (quoting Roe , 410 U.S. at 164-65, 93 S.Ct. 705 ).
This court has never adopted the undue burden standard. But it has, as acknowledged above, tended to employ a Fourteenth Amendment based approach to challenges invoking both that amendment and section 1 of the Kansas Constitution Bill of Rights. Thus, the trial court and the six members comprising the Court of Appeals plurality predicted this court would adopt the undue burden standard. Several worthy reasons lead us to do otherwise and apply the strict scrutiny standard.
First, the undue burden standard has proven difficult to understand and apply. See Chemerinsky & Goodwin, Abortion: A Woman's Private Choice , 95 Tex. L. Rev. 1189, 1219-20 (2017) (discussing the ambiguities in the Court's articulation of the standard and the internal "tension" of the undue burden test, which "says both that the state cannot act with the purpose of creating obstacles to abortion and that it can act with the purpose of discouraging abortion and encouraging childbirth"). One troubling ambiguity has arisen regarding the level of judicial scrutiny the standard requires. At least one author has referred to the Casey standard as "[a] form of intermediate scrutiny." Fallon, 54 UCLA L. Rev. at 1299. Under this standard, the State must show only an "important" interest in order to successfully defend the challenged legislation. 54 UCLA L. Rev. at 1298. Meanwhile, the Fifth Circuit has interpreted the undue burden test as a form of the rational basis test-i.e., a standard of review even less demanding than intermediate scrutiny. See Greenhouse & Siegel, Casey and the Clinic Closings: When "Protecting Health" Obstructs Choice , 125 Yale L.J. 1428, 1466-67 (2016) (discussing Fifth Circuit cases).
The United States Supreme Court's decision in Whole Woman's Health v. Hellerstedt, 579 U.S. ----, 136 S.Ct. 2292, 2309, 195 L.Ed.2d 665 (2016), did not equate the undue burden test to the rational basis test, and some have argued that Hellerstedt requires courts to apply "close scrutiny." Greenhouse & Siegel, The Difference a Whole Woman Makes: Protection for the Abortion Right After Whole Woman's Health, 126 Yale L.J. Forum 149, 163 (2016). But "close scrutiny"
*495 is not a defined term. It presumably means something very stringent, and Justice Thomas, in his Hellerstedt dissent, apparently believed that the majority had "transform[ed] the undue-burden test to something much more akin to strict scrutiny." 136 S.Ct. at 2324.
These shifting and conflicting pronouncements leave the exact contours of the undue burden test murky. In part, the lack of clarity comes from the fact that neither Casey , in stating the undue burden test, nor any of the cases applying it, including Hellerstedt , have set out the test in, or in relation to, the traditional language used for the three tiers of scrutiny.
Further, the undue burden standard has been criticized by some of our sister courts for leaving judges to subjectively gauge what is an undue burden-something that varies based on a judge's own views and experiences as well as on the circumstances of each pregnant woman. See, e.g., Planned Parenthood , 915 N.W.2d at 239 (" '[A] regulation held to be an undue burden by one judge could just as easily be found to be reasonable by another judge because the gauge for what is an undue burden necessarily varies from person to person.' "); 915 N.W.2d at 232 ("Abortion regulations impact different women in many different ways.... There are few hurdles that are of level height for women of different races, classes, and abilities."). There, the Iowa Supreme Court also observed-in our view, correctly:
"When a state regulates abortion in furtherance of its interest in potential life, the undue burden standard solely measures the impact the regulation has on women's ability to receive the procedure.... More, however, can be at stake. A standard that only reviews the burdens of the regulation fails to guarantee that the objective of the regulation is, in fact, being served and is inconsistent with the protections afforded to fundamental rights." 915 N.W.2d at 240.
Another reason not to default to the federal undue burden standard is that this court's precedent indicates application of strict scrutiny is appropriate. Traditionally this court has reviewed ordinances and statutes for violations of section 1 of the Kansas Constitution Bill of Rights using the three tests applied to equal protection challenges under the Fourteenth Amendment by the United States Supreme Court: rational basis, intermediate scrutiny, and strict scrutiny. See, e.g., State ex rel. Schneider v. Liggett , 223 Kan. 610, 618, 576 P.2d 221 (1978) (practice of medicine not a fundamental interest under Constitution; therefore, traditional rational relationship test applied); Henry v. Bauder , 213 Kan. 751, 762, 518 P.2d 362 (1974) (Kansas automobile guest statute imposing legal liability on driver only if guilty of some act constituting recklessness or willful or wanton misconduct fails rational basis test).
Significantly, in Farley , 241 Kan. at 670-71, 740 P.2d 1058, a case in which this court expressly decided the issue of a statute's constitutionality based on section 1's guarantee of equal protection rather than the Fourteenth Amendment's, we considered the possibility of applying strict scrutiny. Under the facts of the case, which did not involve a natural right, the court decided to apply the intermediate scrutiny standard to declare unconstitutional a statute that abolished the collateral source rule in medical malpractice litigation. 241 Kan. at 672, 678, 740 P.2d 1058.
In short, although there are no Kansas cases applying strict scrutiny to natural rights, Farley and other cases suggest the standard is available. See Limon , 280 Kan. at 283-84, 287, 122 P.3d 22 (although applying rational basis analysis, recognizing tiers of scrutiny in an equal protection analysis under section 1 ).
The State urges us to distinguish these cases as dealing with equal protection rather than substantive rights and to refuse to expand the tiered scrutiny approach to include the latter. But the State does not explain why section 1 should be applied in two different ways-one way for an equal protection analysis and another for violation of a substantive right. We can perceive no doctrinal basis for doing so. And certainly nothing in the language of section 1 suggests a textual reason for doing so. In our view the same judicial standard of review should apply to this case arising under section 1. And strict scrutiny has been applied outside of equal protection-and due process. See, e.g., *496 R.A.V. v. St. Paul , 505 U.S. 377, 382, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (under First Amendment to the United States Constitution, content-based laws-those that target speech based on its communicative content-are subject to strict scrutiny). It serves as an appropriate test when fundamental rights are at issue.
As further support for our adopting the strict scrutiny standard, we note it has been applied by a majority of other courts that have determined their state constitutions provide a right to decide whether to continue a pregnancy. See, e.g., Valley Hosp. Ass'n v. Mat-Su Coalition , 948 P.2d 963, 969 (Alaska 1997) (constitution allows constraint of abortion rights only when it serves a "compelling state interest" and "no less restrictive means could advance that interest"); Committee to Defend Reprod. Rights v. Myers , 29 Cal. 3d 252, 262, 276, 172 Cal.Rptr. 866, 625 P.2d 779 (1981) ("only the most compelling of state interests" could possibly justify impairment of "fundamental constitutional right to choose whether or not to bear a child"); In re T.W. , 551 So.2d 1186, 1192-93 (Fla. 1989) (statute interfering with a woman's decision to continue a pregnancy violates her constitutional rights unless the regulation " 'serves a compelling state interest and accomplishes its goal through the use of the least intrusive means' "); Hope Clinic for Women, Ltd. v. Flores , 372 Ill.Dec. 255, 991 N.E.2d 745, 765-67 (2013) (abortion regulations must withstand strict scrutiny); Planned Parenthood , 915 N.W.2d 206, 237-41 (because decision whether to end a pregnancy is a fundamental liberty, strict scrutiny applies); Women v. Gomez , 542 N.W.2d 17, 31 (Minn. 1995) (state statutes affecting a woman's fundamental right to choose whether to continue a pregnancy are subject to strict scrutiny); Armstrong v. State , 296 Mont. 361, 374-76, 989 P.2d 364 (1999) (infringement on women's right to obtain pre-viability abortion unconstitutional unless provision is narrowly tailored to effectuate compelling interest); Planned Parenthood v. Sundquist , 38 S.W.3d 1, 15 (Tenn. 2000) (because abortion regulations interfere with fundamental right, such regulations must withstand strict scrutiny), superseded by amendment Tenn. Const. art. I, § 36 (2014). But see Moe , 382 Mass. at 655-58, 417 N.E.2d 387 (impairment of fundamental right of choice assessed by balancing state interest against pregnant woman's interest); Fordice , 716 So.2d at 655 (assessing statutes impairing access to abortion under undue burden standard instead of usual compelling interest standard applied to violations of right to privacy; privacy right to abortion "much more complex"); Voinovich , 89 Ohio App. 3d at 702-03, 627 N.E.2d 570 (adopting Casey undue burden analysis for restrictions that interfere with liberty right to choose abortion; holding equal protection analysis requires abortion restrictions to be " 'tailored to further an important government interest' "; state must demonstrate " 'exceedingly persuasive justification' ").
Finally, and perhaps most importantly, we adopt the strict scrutiny standard because it is our obligation to protect (1) the intent of the Wyandotte Convention delegation and voters who ratified the Constitution and (2) the inalienable natural rights of all Kansans today. And the strict scrutiny test best protects those natural rights that we today hold to be fundamental.
We agree with the concurring opinion that both the undue burden and strict scrutiny tests start with determining how governmental action burdens or infringes on a right. But significant differences between the two standards makes the undue burden standard less rigorous for the State to meet. We mention some of the most consequential ones.
First, under the strict scrutiny standard, the State faces a higher burden. As we will discuss in more detail in section 2.4 below, once a plaintiff proves an infringement-regardless of degree-the government's action is presumed unconstitutional. Then, the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it. See, e.g., Reed v. Town of Gilbert , 576 U.S. ----, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015) (in free speech context, holding "[c]ontent-based laws-those that target speech based on its communicative content-are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling *497 state interests"); Fisher v. University of Texas at Austin , 570 U.S. 297, 310, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) ("[s]trict scrutiny is a searching examination, and it is the government that bears the burden"); Liggett , 223 Kan. at 617, 576 P.2d 221 (when strict scrutiny applies state has burden of proof).
On the other hand, Hellerstedt -with the undue burden test-"essentially engages in ad hoc balancing of the individual and state interests involved, seemingly distributing the burden of proof roughly evenly between the plaintiff and state in a given case." (Emphasis added.) McDonald, A Hellerstedt Tale: There and Back Again ?, 85 U. Cin. L. Rev. 979, 1012 (2018). This balancing test relieves the State of some of the burden of proof and from having to narrowly tailor an infringement to the interest it seeks to protect. As long as that infringement-the burden on abortion access-is less than the benefit, it is constitutional. See Hellerstedt , 136 S.Ct. at 2309.
Second, the undue burden test requires only that the governmental interest be " 'legitimate' " or " 'valid.' " 136 S.Ct. at 2309. Thus, a weak but legitimate or valid interest-one that is less than compelling-may justify an infringement on a right if the burden is not substantial. In contrast, when the State has to show a compelling interest under strict scrutiny, it must show something that is "not only extremely weighty, possibly urgent, but also rare-much rarer than merely legitimate interests and rarer too than important interests." Fallon, 54 UCLA L. Rev. at 1273. In essence, the undue burden test emphasizes the governmental interest by simply balancing it against the individual rights of Kansans. This is instead of starting with an emphasis on the individual's rights and requiring the government to establish its compelling interest and to prove its action is narrowly tailored to serve that interest-even if the infringement is slight. And by placing their acknowledgment of these individual rights in the first section of Kansans' Bill of Rights, the drafters and adopters of our Constitution made clear the rights are foremost.
Simply put, the undue burden standard-both as set out in Hellerstedt , 136 S.Ct. at 2309, and in the concurring opinion, lacks the rigor demanded by the Kansas Constitution for protecting the right of personal autonomy at issue in this case. Further, great uncertainty exists about when-and how-to apply the standard to different abortion restrictions in the future. See McDonald, 85 U. Cin. L. Rev. at 1005-06 (arguing Hellerstedt applies only to maternal health regulations and not to persuasion regulations, which arguably continue to be subject to Casey 's more deferential approach). The standard also lacks the predictability the concurring opinion seeks to attach to it by criticizing the varied outcomes of strict scrutiny caselaw. As one legal commentator has noted: "As framed by Whole Woman's Health [v. Hellerstedt ], the outcome of undue-burden analysis depends heavily on the facts of an individual case. Fact-intensive litigation rarely yields generalizable rules or consistent results." Ziegler, Rethinking an Undue Burden : Whole Woman's Health's New Approach to Fundamental Rights , 85 Tenn. L. Rev. 461, 512 (2018).
For similar reasons we also reject the dissent's position that a governmental regulation, such as S.B. 95, is constitutional as long as it is not arbitrary, irrational, or discriminatory and is reasonably related to the common welfare. Op. at 550-51, 551-52. Like the United States Supreme Court, this court has held that an exercise of the police power does not ensure constitutionality. Rather, "[w]hile the legislature is vested with a wide discretion ..., it cannot, under the guise of the police power, enact unequal, unreasonable or oppressive legislation or that which violates the Constitution ." (Emphasis added.) Londerholm , 195 Kan. at 760, 408 P.2d 877. Simply adopting the dissent's test sets too low a bar when protecting a natural right from unconstitutional governmental encroachment.
At issue here is the inalienable natural right of personal autonomy, which is the heart of human dignity. It encompasses our ability to control our own bodies, to assert bodily integrity, and to exercise self-determination. It allows each of us to make decisions about medical treatment and family formation, including whether to bear or beget a child. For women, these decisions can include *498 whether to continue a pregnancy. Imposing a lower standard than strict scrutiny, especially mere reasonableness, or the dissent's "rational basis with bite"-when the factual circumstances implicate these rights because a woman decides to end her pregnancy-risks allowing the State to then intrude into all decisions about childbearing, our families, and our medical decision-making. It cheapens the rights at stake. The strict scrutiny test better protects these rights. See, e.g., Farley , 241 Kan. at 669-70, 740 P.2d 1058.
All of these reasons persuade us that any government infringement of the inalienable natural right of personal autonomy requires the State to establish a compelling state interest and to show that S.B. 95 is narrowly tailored to promote it.
2.3 The Doctors Established They are Substantially Likely to Show that S.B. 95 Impairs Natural Rights.
Of course, before a court considers whether a governmental action survives this test, it must be sure the action actually impairs the right. In some cases, it will be obvious that an action has such effect. Imprisonment, for example, obviously impairs the right to liberty. In other cases, the court may need to assess preliminarily whether the action only appears to contravene a protected right without creating any actual impairment. See Casey , 505 U.S. at 873, 112 S.Ct. 2791 (plurality opinion) (noting that "not every law which makes a right more difficult to exercise is, ipso facto , an infringement of that right"). See generally Limon , 280 Kan. at 284, 122 P.3d 22 (noting multi-step process, first of which is deciding whether legislation actually creates discriminatory classification before deciding whether the classification impermissibly infringes constitutional rights).
The trial court, although applying a different standard, made factual findings establishing the broad brush of S.B. 95. It found that criminalizing the performance of the D & E procedure limits second-trimester abortion options to procedures that carry increased risks, are untested in some circumstances, require extra steps and time, and may be impossible in some cases-all with no established health and safety benefit for the woman. The increased risks and lack of medical research associated with the remaining options will force a woman to gamble with other aspects of her health if she chooses to end her pregnancy. Finally, S.B. 95's requirement that doctors perform procedures for which there are no known health advantages and subject their patients to the aforementioned risks, uncertainty, and hardship-especially when safe, effective, and less intrusive means exist-will undoubtedly test the boundaries of medical ethics and threaten the already small number of providers willing to perform second-trimester abortions. These implications make the procedures more dangerous and, for some, will delay or completely prevent the exercise of an inalienable natural right.
2.4 The Trial Court Did Not Err by Failing to Apply a Presumption of Constitutionality.
The State also argues the trial court was required to presume that S.B. 95 was constitutional when deciding whether the Doctors had shown a substantial likelihood of prevailing on the merits. Instead, the State contends, the trial court ignored this presumption, effectively shifting the burden of proof to the State and forcing it to prove that S.B. 95 is constitutional. It argues this improper shift colored the court's findings of facts and impermissibly tipped the scale in the Doctors' favor.
The Doctors respond that the right to abortion is a fundamental right and, consequently, a presumption of constitutionality would be contrary to Kansas caselaw. Alternatively, the Doctors contend that even if the trial court should have applied a presumption of constitutionality, they overcame this presumption.
This is a legal issue and therefore our review is de novo. Apodaca v. Willmore , 306 Kan. 103, 106, 392 P.3d 529 (2017).
The State is correct in its assertion that, generally, "[a] statute comes before the court cloaked in a presumption of constitutionality and it is the duty of the one attacking the statute to sustain the burden of proof." Liggett , 223 Kan. at 616, 576 P.2d 221.
*499 When a statute is presumed constitutional, "all doubts must be resolved in favor of its validity. If there is any reasonable way to construe that statute as constitutionally valid, this court has the authority and duty to do so." Miller v. Johnson , 295 Kan. 636, 646-47, 289 P.3d 1098 (2012).
"A more stringent test has emerged, however, in cases involving 'suspect classifications' or 'fundamental interests.' Here the courts peel away the protective presumption of constitutionality and adopt an attitude of active and critical analysis, subjecting the classification to strict scrutiny." Liggett , 223 Kan. at 617, 576 P.2d 221. In such a case, "the burden of proof is shifted from plaintiff to defendant and the ordinary presumption of validity of the statute is reversed." Farley , 241 Kan. at 670, 740 P.2d 1058. This burden shift stems from the recognition that government infringement of a fundamental right is inherently suspect. When considering government-instituted racial classifications, the United States Supreme Court has explained that such suspicion demands a " 'searching judicial inquiry' " as a way to " ' "smoke out" illegitimate' " governmental action by " 'assuring that [the government] is pursuing a goal important enough to warrant use of a highly suspect tool.' " Johnson v. California , 543 U.S. 499, 506, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (quoting Richmond v. J.A. Croson Co. , 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 [1989] [plurality opinion] ).
Section 1 protects an inalienable natural right of personal autonomy, which today we hold to be fundamental. Presuming that any state action alleged to infringe that right is constitutional dilutes the protections established by our Constitution. Thus, to the extent that the trial court actually refused to apply a presumption, it did so correctly.
Furthermore, we question the State's legal theory that the failure to apply a presumption colors a court's findings of fact. The State produces no support for this assertion. And, even if there is some legitimacy to its argument, it is of no consequence here because none of the State's factual assertions directly contradict the trial court's findings. Thus, even if the failure to apply a presumption would have altered the way the court assessed the facts, any error in not applying that presumption was harmless and gives us no reason to disturb the trial court's findings. See K.S.A. 2018 Supp. 60-261 ("Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); State v. McCullough , 293 Kan. 970, 983, 270 P.3d 1142 (2012) (An error is harmless when there is no reasonable probability that the error affected the trial's outcome in light of the entire record).
2.5 The Trial Court Abused Its Discretion by Applying the Wrong Legal Standard, but the Result Would Be the Same.
Accepting the trial court's factual findings, we now ask the ultimate question before us in this appeal: Did the trial court abuse its discretion when it concluded that the Doctors were substantially likely to prevail on the merits of their claim? See Downtown Bar and Grill , 294 Kan. at 191, 273 P.3d 709 (on first prong of temporary injunction test, plaintiffs need show only that they are substantially likely to win, not that they absolutely will). The trial court did not apply a strict scrutiny standard when answering this question. Nor did 13 of the 14 Court of Appeals judges. Although the concurring judge did not label his standard "strict scrutiny," it had some similarities. See Hodes , 52 Kan. App. 2d at 328, 368 P.3d 667 (Atcheson, J., concurring) ("[E]ven a fundamental right may be regulated to advance an essential governmental interest, so long as the regulation is carefully circumscribed and does no more than required to advance that interest."). Applying the wrong legal standard constitutes an abuse of discretion. See Ward , 292 Kan. at 550, 256 P.3d 801 (A trial court abuses its discretion if its decision is [1] arbitrary, fanciful, or unreasonable; [2] based *500 on an error of law; or [3] based on an error of fact.).
Nevertheless, when a trial court applies the wrong standard, remand for it to apply the correct standard is not always necessary. Cf. Stueckemann v. City of Basehor , 301 Kan. 718, 750-51, 756, 348 P.3d 526 (2015) (affirming district court's inquiry that met expansive concept of reasonableness in test later articulated by Supreme Court); State v. Prado , 299 Kan. 1251, 1260, 329 P.3d 473 (2014) (declining to remand for additional findings where record was sufficiently developed for appellate court to conclude attorney conflict of interest existed). As in those cases, we conclude a remand is not necessary here because the result would be the same.
Although the State only argued in the trial court that, if the Kansas Constitution protects a right to end a pregnancy, S.B. 95 is constitutional under the undue burden standard, we conclude that remand to consider whether the Doctors have shown they are substantially likely to prevail on the merits in light of the strict scrutiny standard we set out today is not necessary. See Downtown Bar and Grill , 294 Kan. at 191, 273 P.3d 709. The trial court and the Court of Appeals plurality held there was a substantial likelihood S.B. 95 could not survive Casey 's undue burden test, which in our view is a lesser standard. Stenberg , 530 U.S. 914, 120 S.Ct. 2597, and Gonzales , 550 U.S. 124, 127 S.Ct. 1610 -the two cases that guided the trial court and the Court of Appeals plurality-illustrate this point.
In Stenberg , the United States Supreme Court considered a Nebraska law that banned two types of abortions it labeled as " 'partial birth' " procedures, including the D & E procedure at issue in the instant case and an "intact" D & E procedure. Intact D & E procedures occur in one of two ways, depending on whether the fetus presents head first or feet first. The feet-first method is known as "dilation and extraction" or "D & X." 530 U.S. at 927, 120 S.Ct. 2597.
The Stenberg Court found two reasons the statute violated women's constitutional right to access abortion. First, the statute did not include a health exception allowing use of the targeted procedures when the mother's health was endangered. 530 U.S. at 929-30, 120 S.Ct. 2597. Second, the Court concluded the Nebraska law placed an undue burden on a woman's right because it subjected physicians who performed the most common type of second-trimester abortion (the D & E procedure) to criminal prosecution. 530 U.S. at 945-46, 120 S.Ct. 2597. In so holding, the Supreme Court stated that the Constitution protects against abortion regulations imposing "significant health risks," whether those risks "happen[ ] to arise from regulating a particular method of abortion, or from barring abortion entirely." 530 U.S. at 931, 120 S.Ct. 2597.
In combination, these holdings indicate a woman has a federal constitutional right to access an abortion, including whenever it is necessary to protect her health. A regulation that prevents her from accessing the safest method of abortion for her places an undue burden on that right. These holdings have particular significance in this case, where the trial court found that S.B. 95 has removed access to the method for performing a second-trimester abortion that is the safest in most cases.
Seven years later, in Gonzales , 550 U.S. at 141, 168, 127 S.Ct. 1610, again applying the undue burden test, the Court rejected a constitutional challenge to the federal Partial-Birth Abortion Ban Act (PBABA) of 2003, which restricted D & X abortions " 'in or affecting interstate or foreign commerce.' " The Court's conclusion rested, in part, on the fact that abortion by D & E would still be available. 550 U.S. at 164, 127 S.Ct. 1610.
In light of these decisions, the Kansas Court of Appeals plurality, applying the undue burden standard, discussed the impact of these cases on the present case and explained why they persuasively showed that the Doctors are substantially likely to succeed here:
"Kansas has banned the intact D & E abortion procedure since 1998. See K.S.A. 2014 Supp. 65-6721 ; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30. By combining that ban with a new one on the D & E abortion procedure, Kansas has simply attempted to do in two statutes what the *501 United States Supreme Court [in Stenberg ] held Nebraska could not do in one-ban both D & E and intact D & E abortions.
"The State contends, based on Gonzales , that the new Kansas statute is permissible because reasonable alternative procedures remain available. But the circumstances here are quite unlike Gonzales . There, the Court considered a ban on an uncommon procedure and noted that the most common and generally safest abortion method remained available. Here, the State has done the opposite, banning the most common, safest procedure and leaving only uncommon and often unstudied options available." Hodes , 52 Kan. App. 2d at 291-92, 368 P.3d 667 (plurality opinion).
We agree with this reading of Stenberg and Gonzales and the Court of Appeals plurality's analysis of their impact on this case. We would add that, after the Court of Appeals' decision in this case, the United States Supreme Court reiterated, quoting Roe , that the " 'State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.' " Hellerstedt , 136 S.Ct. at 2309 (quoting Roe , 410 U.S. at 150, 93 S.Ct. 705 ). Here, according to the findings of the trial court, through S.B. 95 the State actually thwarts its legitimate interest by taking away a method that is safer for the woman than the alternatives it proposes. See also Danforth , 428 U.S. at 79, 96 S.Ct. 2831 (holding unconstitutional a ban on a method of abortion after finding the ban "force[d] a woman ... to terminate her pregnancy by methods more dangerous to her health"); Gonzales , 550 U.S. at 172, 127 S.Ct. 1610 (Ginsburg, J., dissenting) ("[A] State must avoid subjecting women to health risks not only where the pregnancy itself creates danger, but also where state regulation forces women to resort to less safe methods of abortion.").
As previously noted, the undue burden standard applied in Stenberg and Gonzales and by the Court of Appeals plurality is often viewed as a more lenient standard than strict scrutiny or, at most, something akin to strict scrutiny. Accordingly, even though we would apply what we view as the more demanding strict scrutiny standard for the State to meet, doing so would not change the conclusions reached by the trial court.
2.6 Conclusion: We Affirm the Trial Court's Decision to Impose the Temporary Injunction.
Thus, neither the State's arguments about the application of a presumption nor our determination that strict scrutiny is the most appropriate test of constitutionality makes it necessary to remand this case to the trial court for new findings or additional legal analysis related to the temporary injunction phase. However, we do remand to the trial court for full consideration of the merits of the remainder of the case.
At oral argument, the State posited that if full resolution of the merits is ultimately required in the lower court, then there it might assert state interests in promoting potential life, protecting the dignity of life, protecting medical ethics, and protecting patient safety. We acknowledge some of these interests were argued in the line of cases relied on by the trial court. See Gonzales , 550 U.S. at 157, 127 S.Ct. 1610 (recognizing " 'State's interest in potential life' " and stating, "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession' "); Danforth , 428 U.S. at 79, 81, 96 S.Ct. 2831 (discussing state's interest in patient health and holding unconstitutional a ban on a method of abortion after finding the ban "force[d] a woman ... to terminate her pregnancy by methods more dangerous to her health"). And some of these interests, particularly those of promoting or protecting fetal life and patient safety, have been court-recognized as interests that may be compelling. E.g., Planned Parenthood , 915 N.W.2d at 239. On remand for full consideration of the merits, the State may certainly raise to the trial court any interests it claims are compelling, including those it mentioned at oral argument before this court, and show why S.B. 95 is narrowly tailored to those interests. See Grutter , 539 U.S. at 326, 123 S.Ct. 2325.
3. The Dissent Weakens Section 1 in a Manner the Framers and Ratifiers of the Constitution Did Not Intend.
Although we have responded to some points made by the dissent, we pause here to *502 point out key distinctions between it and the majority opinion. The overriding difference between the opinions is the degree of importance and substance that each attaches to individual liberty. The majority holds that individuals enjoy constitutional protection against unwarranted government intrusion in their personal business, whereas the dissent leaves the individual nearly naked and defenseless, especially in the realm of individual sovereignty.
The dissent is at its strongest when it is in agreement with the majority, that is, when it drives home the historical and legal emphasis on rights accruing to the individual at birth. In particular, the dissent insightfully cites to numerous sources supporting the majority position that government may interfere with essential personal rights only when "necessary," which can be characterized as saying that the government may interfere with essential personal rights only when its actions pass a test of strict scrutiny. The dissent cogently argues that it is up to the courts to protect the individual from "unchecked" police power exercised by the State.
But the dissent is at its weakest when it takes the majority's reliance on individual rights and distorts that argument into one that favors a government-first reasoning. The dissent finds itself in a painful dilemma: It feels obligated to hold that government may intrude with impunity on the most fundamental of natural human rights, the right of personal autonomy-in particular, the right to make medical decisions about oneself; but it also wants to hold itself out as favoring constitutionally limited government power.
In order to resolve this conflict, the dissent engages in a fantastic acrobatic midair twist. It contends that government should come from rights first, but then maintains that government should be largely unrestrained in exercising its power over the personal sovereignty of pregnant women. The dissent achieves this astonishing reversal by fervently arguing that the Kansas Constitution Bill of Rights was intended to protect the pre-political rights of Kansans. But that argument eventually leads, of course, to the same conclusion that the majority reaches.
As a consequence, the dissent is forced to mischaracterize the majority opinion. It attempts to portray the majority as paternalistic and authoritarian, endorsing government power at the expense of citizens' rights, e.g., personal autonomy. But it is the dissent who argues for a government largely unfettered by constitutional constraints, with the State deciding for the individual what is best for that individual.
The dissent concedes that some state action may violate the protections of section 1 but only if such exercise of police power is completely arbitrary, irrational, or discriminatory. The dissent ultimately favors limited state powers that in reality have no practical limits. Presumably, if the Legislature were to mandate that all males receive vasectomies at the age of 18 in order to limit population density and therefore enhance respect for human dignity, the dissent would find no constitutional conflicts. The dissent's vision of government and rights is one of regal government powers, powers that sweep away individual liberty in favor of a majoritarian dictate. In the dissent's view, the Kansas Constitution Bill of Rights is akin to a gentle reminder not to disturb liberty very much but with no legal consequences if government ignores that reminder.
CONCLUSION
We hold today that section 1 of the Kansas Constitution Bill of Rights protects all Kansans' natural right of personal autonomy, which includes the right to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life-decisions that can include whether to continue a pregnancy.
Under our strict scrutiny standard, the State is prohibited from restricting that right unless it can show it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest. The Doctors have shown they are substantially likely to prevail on their claim that S.B. 95 does not meet this standard. So the trial *503 court's temporary injunction enjoining the enforcement of S.B. 95 is appropriate.
On remand to the trial court for a full resolution of the issues on the merits, the State is certainly free to assert any interests it believes compelling and show how S.B. 95 is narrowly tailored to those interests. We are aware that the evidentiary record is sparsely developed because of the narrow issue previously before that court: simply whether a temporary injunction should be granted. We, thus, decline the concurring opinion's invitation to guess at what the arguments and evidence might be in order to provide guidance on remand.
To this point, despite the criticism of the concurring opinion, we will not accept the challenge to become a trial court ourselves. The conclusions the concurring opinion asks us to draw should rest on the evidence actually or eventually presented, not on hypotheticals and theories. It may be that the trial court will make holdings that are similar or even identical to those made by the Iowa Supreme Court in Planned Parenthood , 915 N.W.2d 206 -a decision the concurring opinion lauds. But it is premature for us to do so. The Iowa Supreme Court's decision came after trial-after evidence was available for review and after a trial court had made findings of fact. See also Gannon v. State , 298 Kan. 1107, 1171, 319 P.3d 1196 (2014) (setting out new legal test and remanding case for trial court to apply test to evidence already or eventually to be produced). Ironically, the concurring opinion even recognizes this, noting that the Iowa decision was "based on credible trial evidence" and was based "on evidence showing waiting periods do not change women's decisions whether to have an abortion." Op. at 511.
The trial court undoubtedly has a heavy task ahead of it. Not only must it grapple with one of the most divisive issues of our time, it must also take into account advances in science that have blurred the sharp trimester-based lines used in Roe 's strict scrutiny analysis. And it must do this with a deep awareness that the outcome of this case could generate a profound and personal consequence for many women. But we have great confidence in the trial court's ability to meet this challenge while applying strict scrutiny and the understandings developed over many years in various United States jurisdictions of what constitutes compelling interests and a narrow tailoring to those interests. The term "strict scrutiny" was first articulated by the United States Supreme Court in 1942, and courts have utilized the test in various contexts for over half a century. See Shapiro v. Thompson , 394 U.S. 618, 658-60, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting) (explicitly describing two prongs of test and citing older cases for analogous support), overruled in part for other reasons by Edelman v. Jordan , 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ; see also Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny , 48 Am. J. Legal Hist. 355, 355-56 (2006). We note that the strict scrutiny standard provides considerable guidance to a trial court-more so than the undue burden standard urged by the concurrence, a standard that has never been applied by this court in any context.
In its merits resolution, the trial court will "adopt an attitude of active and critical analysis," as it performs its " 'searching judicial inquiry.' " Liggett , 223 Kan. at 617, 576 P.2d 221 ; Johnson , 543 U.S. at 506, 125 S.Ct. 1141 (quoting Richmond , 488 U.S. at 493, 109 S.Ct. 706 ). As it does so, it should remain mindful of the words of former Kansas Attorney General and Supreme Court Justice Harold Fatzer. "[C]ourts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such a case lies with the people." Harris , 192 Kan. at 206-07, 387 P.2d 771. On the other hand, "[t]he judiciary ... has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people." Harris , 192 Kan. at 206, 387 P.2d 771. So "when legislative action exceeds the boundaries of authority limited by our Constitution, and transgresses a sacred right guaranteed or reserved to a citizen , final decision as to invalidity of such action must rest exclusively with the courts." ( Emphasis added.) 192 Kan. at 207, 387 P.2d 771.
*504 The decision of the Court of Appeals is affirmed; the trial court's ruling on the Doctors' motion for temporary injunction is affirmed; and this case is remanded to the trial court for further proceedings consistent with this decision.
* * *